**Daniel HENRY, et al.**[*]

v.

**The SS BERMUDA STAR, et al.**

Nos. 85–5307, 86–3855.

United States District Court,
E.D. Louisiana.

February 10, 1987.

Gregory P. Beron, New Orleans, La., for plaintiffs.

Christopher O. Davis, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for defendants.

---

[*] Additional Plaintiffs: Errol Cox, Peter Blake, Salguero, Julio Cesar, Rodolfo Lopez, Oldin Pinace Carnicero, Jean Charles Hyppolite, Manuel Antonio Rodriguez, Antonio Avelar Cruz, Herman Carcamos, Oliver Brown, Alberto Antonio, Pondler, Bertram H., Francisco Ayala Chavez, Bertram Pondler, Alonso Martinez, Elvis Roberto Chiezza, Alonso Mendosa, Jorge Roberto Salguero, Juan V. Pondler, Woldeman Hebbert, Samuel Herbert Boyd, Criseldo Robles, Earcy Watson, Lino Luis Ramirez, Marco Antonio Diaz, Phebe Wilner, Rafael Leiva, Daniel Brown, Manuel De Jesus Cruz, Edgar Charorrio Compa, Leonel Rivas, Oscar Guillen, Louis Herrera, Linares, Chacon Roberto, Alberto S. Antonio, Linton Downs, Carey Watson, Rolando Canales, Hubert H. Hall, Osvaldo, Mata Manueles, Santos Batiz, Carlton Kennedy, Mauro Pena, Arnold, Leiva L., Oscar Martinez.

**ORDER & REASONS**

CHARLES SCHWARTZ, Jr., District Judge.

This matter is before the Court on motion for summary judgment in favor of defendant Bahama Cruise Line, Inc., disponent owner of the SS BERMUDA STAR, seeking dismissal of plaintiffs' claims for recovery of wages, overtime and vacation pay allegedly due under Panamanian law,[1] as well as for penalty wages, repatriation expenses and monies allegedly paid by plaintiffs to third parties to secure employment aboard the SS BERMUDA STAR. These claims were originally filed on November 15, 1985, on behalf of crew members Daniel Henry and others. On October 15, 1986, claims filed on behalf of certain additional plaintiffs, Ramon Rodriguez Alvarez and others, were transferred from the Southern District of New York to the Eastern District of Louisiana and consolidated with the action brought on behalf of Daniel Henry, et al.

Because resolution of the legal issues implicit in defendant's motion for summary judgment turned on Panamanian law, the Court appointed Mr. Humberto Ricord as Special Master as an expert on Panamanian law.[2] The defendant's motion for summary judgment was considered as to both the case originally filed in the Eastern District of Louisiana and the case emanating from the Southern District of New York, due to the identity of legal issues implicit in the two cases.

The specific issues referred to the Special Master for consideration were set forth in the Court's Minute Entry of August 18, 1986, as follows:

1. What is the law of the Republic of Panama concerning wages and overtime pay that must be paid to crew members employed on vessels registered in the Republic of Panama and engaged in international maritime commerce?

2. What is the law of the Republic of Panama concerning the payment of additional monetary benefits not considered wages, in particular the "Thirteenth Month" provided under Cabinet Decree No. 221 of 1971, vacation, repatriation and Sunday/holiday pay to crew members who are employed on vessels registered in the Republic of Panama and engaged in international maritime commerce?

3. Are the contractual wages, overtime pay and benefits paid to the plaintiffs by the defendant proper under the law of the Republic of Panama?[3]

4. Are plaintiffs entitled under the law of Panama to any further payment of wages, overtime pay and benefits other than that which they have already received from defendant?

The Special Master issued his report on November 17, 1986, and it was received by

---

1. The parties agree that Panamanian law governs plaintiffs' claims; the parties' legal arguments reflected varying interpretations of Panamanian law; and each side submitted opposing affidavits of experts on Panamanian law. Application of Panamanian law to the pivotal issues is also supported by the plaintiffs' employment contracts and shipping articles, both of which provide for application of Panamanian law. *See also Lauritzen v. Larsen,* 345 U.S. 571, 584, 73 S.Ct. 921, 929, 97 L.Ed. 1254 (1953); *Grivas v. Alianza Cia. Armadora, S.A.,* 276 F.2d 822 (2d Cir.1960).

2. By Minute Entry of August 1, 1986, the Court invited the parties to advise whether they wished a hearing to show cause why Mr. Ricord should not be appointed as Special Master. Having heard no objection to Mr. Ricord's appointment, the Court proceeded to confirm his appointment as Special Master by Minute Entry of August 21, 1986. Plaintiffs in the consolidat-

ed action (the Alvarez plaintiffs) joined the initial case on October 15, 1986, but filed no objection to the appointment of Mr. Ricord even though the record herein clearly reflected Mr. Ricord's appointment, nor did the Alvarez plaintiffs voice any objection to Mr. Ricord's appointment at the status conferences held October 15, 1986 and November 12, 1986 or at any other time. Moreover, the Alvarez plaintiffs have brought to the Court's attention no grounds upon which this Court would base a finding that Mr. Ricord's appointment was inappropriate.

3. The Special Master was expressly advised not to perform mathematical calculations, if any, necessary to determine whether a particular plaintiff has in fact received all amounts due him. The application of what this Court perceives as the governing legal principles to each particular plaintiff in these consolidated proceedings is a matter remaining for resolution.

this Court and filed of record on December 1, 1986. A copy of the Special Master's report is attached hereto as "Appendix A." [4]

In response to the first question, the Special Master concluded that the applicable Panamanian law, found in Executive Decree No. 21 of 1982, dictates wages at a rate of 0.59 Balboas (or $0.59) per hour as the minimum salary for crew members contracted outside of the territory of Panama, and overtime pay of 25% of accrued wages as provided by Article 261 of the Labor Code, or such higher wages or overtime pay as may be provided in an individual contract or in the ship's articles. Thus, defendant is correct in its provision for and calculation of base salary and overtime pay at rates of 0.59 Balboas per hour and 25% respectively.

The Special Master further concluded that the "Thirteenth Month," established as a "special bonus" by Cabinet Decree No. 221, November 18, 1971, to be paid in addition to salary, is not applicable to members of the crew of a Panamanian vessel engaged in international maritime commerce, because it is not part of the laws applicable to the contracts of crew members on such vessels, and because the Cabinet Decree itself does not expressly provide for its applicability to the types of contracts here at issue.

As to vacations, the Special Master concluded vacations from maritime work in international trade are regulated by Article 262 of the Labor Code. Article 262 provides for vacation time computed according to the more favorable of international usages or the legal minimum of twelve to eighteen days vacation "for each year of uninterrupted service," with no right to fractional vacation for service periods less than a year. Since the individual contracts of the plaintiffs in this case provide for fourteen and fifteen days annual vacation, plaintiffs have no right to claim additional pay for vacation over and above those fourteen to fifteen days.

The Special Master further concluded the contracts properly provide for repatriation as provided by Article 255 of the Code; that plaintiffs are not entitled to claim additional pay for work on Sunday and national holidays; and that any work performed on vessels during Sundays and national holidays is properly governed by the provisions of the shipping articles and labor contracts on wages and overtime.

Lastly, the Special Master concluded that the contractual wages, overtime pay and benefits paid to the plaintiffs by the defendant were proper under the laws of Panama and concluded that plaintiffs are not entitled to any other payments of salaries, overtime or monetary benefits in addition to what they have received from the defendant.

The Special Master's report provides the reasoning behind the above mentioned conclusions and exhaustively details the bases for his conclusions, supported by citations to the Panamanian code. Contradictory judicial precedent is carefully distinguished by the Special Master and his reasoning appropriately employs the civilian methodology dictated by application of the law of a civilian jurisdiction such as Panama. Although jurisprudence may be reviewed in order to procure whatever guidance it may offer, the civilian system is not dependent upon precedent in the interpretation and application of its laws.

The only challenge to the Special Master's report which gave this Court pause concerned the issue of repatriation expenses. This issue arises within the context of the employment contracts' provision that:

> The employer reserves the right to withhold one tenth of the employee's gross monthly pay until a return air ticket to his country of origin is accumulated, as costs toward repatriation expenses, should the employee not complete the full term of this agreement, but such deduction will be refunded in full at the completion of this agreement.

**4.** The Report was also rendered in Spanish, and the Spanish version is also filed of record herein.

The Court does not address at this time whether each particular plaintiff has in fact been refunded amounts withheld under this clause of the employment agreements, either in money (for those employees as to whom defendant must pay repatriation costs) or in kind as a return air ticket (for those employees as to whom repatriation expenses were not payable by defendant). Rather, the Court has assumed pro arguendo that some form of repatriation expenses have been paid by defendant when owed and that amounts withheld were in fact applied to return air tickets in those instances when repatriation expenses were not owed. The Court's focus here is on the issue whether the defendant's practice of withholding amounts to be applied to repatriation expenses constitutes a violation of 46 U.S.C. § 10315, rendering the defendant liable for the penalties provided in 46 U.S.C. § 10313.

■ The Special Master concluded that the defendant's actions as to repatriation expenses do not violate Panamanian law and are consistent with Panamanian Code Article 255. The Court accepts this conclusion as to Panamanian law and rejects plaintiffs' interpretation of that Code Article, based upon translations in the record and persuasive authority emanating from the Southern District of New York. *See Vinuela v. S.S. BRITANIS*, 647 F.Supp. 1139 (S.D.N.Y.1986). However, this Court felt bound to evaluate on its own the arguments raised under Title 46 of the United States Code.

Section 10315 (formerly section 599) provides a listing of certain permissible "allotments" from seaman's wages and provides by its terms that it is applicable to foreign vessels in U.S. waters.[5] Plaintiffs urge the withholdings here in question are also foreclosed under the Supreme Court's interpretation of the predecessor statute to 46 U.S.C. § 10315, citing *Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 72 S.Ct. 1011, 96 L.Ed. 1294 (1952).

*Isbrandtsen* concerned the propriety of a vessel owner's deducting, from wages due a seaman (Mr. Johnson) upon his discharge from service, amounts incurred by the vessel owner in medical expenses for a fellow seaman who was wrongfully attacked by Johnson. The Supreme Court affirmed the lower courts' judgments for wages and transportation in favor of Johnson, disallowed the seaman's claim for penalty wages, but also rejected the vessel owner's counterclaim for the medical expenses.[6] The Supreme Court noted Congress' careful and specific regulation of a seaman's right to final payment upon discharge stating, "Congress has gone so far in expressly listing such deductions and set offs that it is a fair inference that those listed may not be made." 343 U.S. at 789, 72 S.Ct. at 1017.

However, this Court finds *Isbrandtsen Co. v. Johnson* entirely distinguishable in view of the nature of the "set off" there involved, which amounted to a permanent deprivation of wages otherwise earned. The plaintiffs in the case before this Court have not cited any authority for the proposition that the parties may not agree to what is in effect a delay in payment of wages by withholding a certain amount until either completion of the contract term or discharge; the BERMUDA STAR seaman's right to wages merely accrues biweekly by contract with the exception of

---

5. 46 U.S.C. § 10315 provides in pertinent part:
   (a) Under prescribed regulations, a seaman may stipulate as follows in the agreement required by section 10302 of this title for an allotment of any part of the wages the seaman may earn:
   (1) to the seaman's grandparents, parents, spouse, sister, brother, or children;
   (2) to an agency designated by the Secretary of the Treasury to handle applications for United States savings bonds, to purchase bonds for the seaman; and
   (3) for deposits to be made in an account for savings or investment opened by the sea-

man and maintained in the seaman's name at a savings bank or a savings institution in which the accounts are insured by the Federal Deposit Insurance Corporation or the Federal Savings and Loan Insurance Corporation.

6. Not even that right to wages is absolute, however, because the Supreme Court expressly reserved to the vessel owner its right to pursue claims against the seaman by means other than *the permanent set off attempted* by the vessel owner against wages due on discharge.

the withholdings in question. Because the seamen's federal statutory right to payment of all amounts due for wages does not accrue until either discharge or at the completion of the voyage, the defendant's contracts and its policy of withholding amounts from wages until the end of a contract term or upon discharge do not violate federal statutes.

Moreover, the statute does not address the effect of a "refund" of an "allotment," if indeed amounts withheld to be refunded at the end of a voyage or upon an employee's discharge from service can be classed as "allotments." In addition, the penalty provisions would clearly not apply where wages due, including any amounts withheld, are paid at the end of a voyage or within the proscribed time following an employee's discharge. Thus, if the defendant adheres to its own contractually provided course of action, the Court perceives no violation of United States law.

■ Nor is federal law violated by defendant's policy of refunding such withholdings by procuring a ticket with the withholdings of those seamen as to whom repatriation expenses are *not* due; this action constitutes an appropriate payment in kind when offered at the close of the seaman's employment within statutory time limits. *See American Foreign S.S. Co. v. Matise*, 423 U.S. 150, 96 S.Ct. 410, 46 L.Ed.2d 354 (1975); *Escobar v. S.S. WASHINGTON TRADER*, 640 F.2d 1063 (9th Cir. 1981). Under those cases, an employer may pay wages in kind by furnishing an airplane ticket, where air fare would not otherwise be at the employer's expense. The Court therefore approves the Special Master's findings as to the withholdings.

For the foregoing reasons, the Court finds the reasoning and conclusions of the Special Master to be well founded and adopts the Special Master's Report as part of this Court's Order & Reasons granting summary judgment as to the principles of law governing the plaintiffs' claims.

There remains to be resolved what appears to the Court as primarily an accounting matter, whether the compensations and benefits deemed appropriate by this Court have, in fact, been received by each particular plaintiff in these consolidated cases. However, in order to facilitate resolution of the cases, the Court hereby certifies the granting of partial summary judgment for immediate appeal under 28 U.S.C. § 1292(b), the Court being of the opinion that this order involves controlling questions of law as to which there are substantial grounds for difference of opinion and an immediate appeal from the order will materially advance the ultimate termination of the litigation.

It is thus unnecessary for the Court to undertake at this time to determine what amounts, if any, should be recovered by each individual plaintiff. Accordingly, the Clerk of Court is directed to close the captioned matters administratively, to be re-instituted on this Court's trial docket on motion of any party following issuance of the Fifth Circuit's decision.

Plaintiffs and defendant are cast solidarily for the costs of the Special Master's fee of $3,000. It is accordingly ORDERED that on or before February 23, 1987, plaintiffs shall deposit in the registry of the Court payment in the amount of $1,500, and defendant is likewise directed to pay $1,500 into the registry of the Court on or before February 23, 1987. However, nothing in the foregoing order shall prevent the Court from collecting the entire amount due from either party, should for any reason this Order not be observed. Upon receipt of funds, the Clerk of Court will pay the Special Master from funds deposited.

## APPENDIX A

### REPORT OF SPECIAL MASTER PROF. HUMBERTO E. RICORD

1. The undersigned, Humberto E. Ricord, Doctor in Law and a practising attorney-at-law in the Republic of Panama, has received a letter addressed to him under date of 20th. August, 1986, by Hon. Charles Schwartz, Jr., District Judge of the United States District Court for the Eastern District of Louisiana, in the city of New Orleans.—

2. The aforesaid letter of Judge Schwartz, Jr. requests assistance in deciding certain aspects enumerated in Minute Entry of 18th. August, 1986, which have arisen in the suit filed by Daniel Henry et al against the S/S "BERMUDA STAR" et al—

3. The legal aspects enumerated in the Minute Entry of 18th. August, 1986, relate to wages, overtime and other monetary benefits corresponding to crew members rendering services on Panamanian registered vessels in international maritime commerce.—

4. Before going into the legal aspects of the matters posed by the Minute Entry, I consider it necessary to review, in general terms, the problems of the juridical system applicable to crews of Panamanian vessels engaged in international maritime commerce.

5. It is well to clarify, at the inception, that the Panama Labour Code of 1971 contains an extensive series of articles which apply, in general terms, to all classes of labour contracts; and it also includes certain articles which only apply to a specific type of labor contract.

This legal differentiation is what determines, for example the contrast between Title II of Book I of the Code, which refers, *in general*, to the *Labour Contract* (articles 62 through 97), and Title VII, entitled *Special Contracts* (articles 230 through 281).

The distinction made by the Code, within its own structure, between provisions which refer to *all* labour contracts, on the one hand, and provisions which only apply to the so-called special contracts, on the other, makes it possible to classify those two groups of articles as *general provisions* and *special provisions*, with the result that the special provisions inhibit the application of certain general norms of the Labour Code, especially when they refer to the same subject matters of the special provisions or when, juridically, it is not feasible to apply the *general provisions* to special contracts due to the peculiar nature of the latter.

6. It should also be borne in mind that articles 62 through 97 of the Code are not the only ones having the category of *general provisions*, but other articles of Book I present the same characteristic, as for example article 17 of the Code according to which *"every* employer shall maintain panamanian worker, or foreigners married to a panamanian or with ten years residence in the country, in a proportion of not less than ninety percent of regular workers...."

7. We have just said that special provisions inhibit the application of certain general provisions of the Code, and such is the case in the relation of article 266 and article 17, since if the latter obligates "every" employer to maintain 90% of Panamanian workers, article 266, on the other hand, which is special as to Panamanian vessels in international commerce, only requires 10% of Panamanian seamen, so that we have a case where the application or article 266 (special provision), inhibits the application of article 17 (general provision).—

8. Maritime work, or work on vessels, has two groups of different norms in the Labour Code of 1971, to wit: those which apply to Panamanian vessels in international commerce (articles 251 through 276), and those which apply to coastwise and fishing vessels (articles 277 and 278). These two groups of norms are a consequence of the fact that work on vessels is very different to ordinary work on land, and the Code regulates the work on vessels as a *special contract*, with the two situations mentioned, which are likewise different between themselves.

9. As stated, the law which governs maritime work on Panamanian ships in international commerce, is contained, in its *special aspect*, in articles 251 through 276; but there also exist articles in the Panamanian Constitution which refer, in a *general manner* to salaried work and therefore may be applied as *general norms*, to maritime work (Title III, Chapter III of the Constitution, Articles 60 to 75, as contained in the Constitutional Amendment of 1983).

10. This specialization of the 1971 Code, which also appeared in the Labour Code of 1947, of regulating international maritime

work with provisions applying specifically to contracts with the crew, is due to the following two reasons, in my opinion:

a) Maritime work, by virtue of the place where it takes place, is very different to work performed on land;

b) The Panama Merchant Marine has been, since 1925, one of the largest volume worldwide, and the labour legislation has endeavoured to establish a very special juridical regimen for Panamanian vessels in international trade, due to the fact that the owners or operators of said vessels are of different and varied nationalities and due to the various geographical areas of the world where those vessels carry out their activities.

11. In the very special juridical regulation which Panama laws have established for work on Panamanian vessels of international trade, one may distinguish two basic sources of the law, namely:

a) the legal provisions which the Labour Code establishes for international maritime work (articles 251 to 276);

b) The international maritime customs, the application of which is provided for by articles 260, 262 and 275 of the 1971 Code.

This very especial juridical norm for Panamanian vessels in international commerce emanates from the intent of the legislator or of the law, which are very clear and justified. The Panamanian law establishes certain *basic* articles for international maritime work and, at the same time, authorizes the application of international usage, which arise from the fact previously mentioned, i.e. that the ships of the Panama merchant marine belong to persons of varied nationalities (northamericans, greeks, italians, swedes, germans, etc.) and that said vessels plow the seas in different geographical areas of the world.

In keeping with what has been said in this point, the principle which emanates from the Panama Labour Code of 1971 is that the legal norms applicable to Panamanian ships in international commerce are, *principally*, on the one hand, the special articles of the Code contained in Section First of Chapter VIII, Title VII, Book I,

and on the other hand, by the international maritime usages.—

12. We have just said that the fundamental legal principle emanating from the Panama Labour Code is that, *principally*, the special legal provisions and international maritime usages apply to Panamanian vessels, because in *second place, when necessary*, certain *general* norms of the Code must be applied. For example, if a seaman renders services on an international ship *without a written contract*, then it must be held that there exists a *verbal labour contract*, as provided for in article 66 of the Code. However, this *secondary* application of certain *general* norms of the Code does not contradict the fundamental principle mentioned in points 9, 10 and 11 of this Report.—

13. Articles 234, 245, 251 and 277 of the Code refers to this *secondary* application of certain *general* norms of the Code, in the case of special contracts. Article 234 mentions "the *general provisions* of this Code" and article 277 uses the same phrase. On the other hand, article 245 refers to "the provisions of this Code and the special rules of this Chapter". Article 251 says that the labour relations on vessels in international trade "shall be governed *in general* by this Code and *especially* by the provisions of this Section". The phraseology of the Code is not very uniform, as it should be, but these articles provide for the specific and *preferential* application of the *special provisions*, and authorizes the application of *certain general norms* of the Code. These legal rules which we have cited in this point cannot be interpreted in the sense that they permit the indiscriminate application of *all* of the Code to special contracts, but only of *certain general norms which are compatible with the nature of said special contracts.*

14. It is convenient to refer to some concrete cases of the application of special *legal* norms which inhibit the application of the general norms of the Code. We have already contrasted articles 17 and 266 of the Code.

Another evident case is that of overtime work, since if article 33 of the Code con-

tains a scale of 25% to 75% of surcharges for overtime work, *as a general norm*, article 261 fixes a surcharge of 25% for overtime work on vessels in international trade, as a *special norm*. In addition, the recently enacted Law N° 1 of 17th. March, 1986, provides for "small businesses" that the overtime will carry a single surcharge of 25% (Article 1). These latter two provisions (Article 261 of the Labor Code and Law N° 1 of 1986) rule out the application of the general norm contained in article 33 which refers to overtime rates, in so far as overtime on vessels in international trade and small businesses are concerned.

A third case would be article 54 of the Code (general norm on vacations), which provides for one month vacation after 11 months services, vis-a-vis article 262 of the Code which provides for 18 and 12 days annual vacation for international maritime work.

A specific case regulated by the Code *in an express manner* by virtue of which there is excluded the application of a *general norm* of the Code, thus recognizing the preferential application of the First Section of Chapter VIII, Title VII, Book I, is contained in article 212, section 5). The *general provision* of the Code is contained in article 211, by the terms of wich "the employer may not terminate a labor relation of an indefinite nature unless there exists a just cause provided by law and in keeping with the formalities thereof". But article 212 orders that article 211 shall not apply, inter alia, to "workers on vessels in international service" because the rights of the employer on those vessels are contained in the First Section, Chapter VIII of Title VII, and is not limited by what is provided for in article 211. This exclusion, ordered by article 212, section 5) demonstrates that not all the *general* provisions of the Code apply to work on Panamanian vessels in international trade.

To such an extent it is evident that not all general provisions of the Code apply to seamen, that the Code itself found it necessary to include in its special regulation of those seamen contracts, the provision of article 272 according to which professional sickness and labor accidents of seamen are covered by "the norms relative to Professional Risks contained in Book II of this Code". The application of the general norm on Professional Risks to seamen, then, is done by specific mandate of the Code.

15. It would be gross error to hold that not only the 25% surcharge on overtime provided for in article 261 apply to seamen on Panamanian international vessels, but also that the overtime of said seamen should be paid according to article 33. Such a holding is so erroneous that if it were made extensive to the other cases mentioned in point 14. of this document, it will be seen that it lacks the most minimum juridical foundation. It is indefensible to hold that articles 17 and 266 of the Code may be applied simultaneously, and it is also indefensible to hold that articles 54 and 262 of the Code may be applied at the same time, i.e. simultaneously. Similarly, it is indefensible to hold the erroneous theory that in addition to the 25% surcharge for overtime of seamen provided for in article 261, they should be paid overtime according to the scale of article 33, which goes up to 75%. Since the special rules exclude the application of the general provisions of the same subject, the application of articles 266, 261 and 262 exclude the application of articles 17, 33 and 54 of the Code.

16. We have mentioned in point 11. that the second source of juridical norms applicable to work on Panamanian vessels in international trade, are the international vessels usages. Article 260 expressly mentions "the maritime usages"; article 262 refers to "international maritime usages" and article 275 provides that *"in the cases not regulated in this Code,* there shall be applied the international maritime "usages and customs and the international conventions on the subject". Articles 260 and 262 authorize the general application of the international usages and this is not limited by the phrase "the cases not regulated in this Code". The authorization of articles 260 and 262 to *amply* apply international maritime usages, contradicts, in a sense, the initial phrase of article 275 ("cases not

regulated in this Code") so that this phrase does not have the force and effect which isolatedly and per se could be given to it. If there are two articles (260 and 262) which recognize the application of international maritime usages, without the limitation that the case is not contemplated in the Code, this means that such phrase has a very weak meaning and evidently without any reason.

The conclusion is that "the international maritime usages" are applicable alongside the special norms of Chapter VIII, First Section (articles 251 to 276) and alongside certain general norms of the Code which are compatible with said First Section. The phrase at the beginning of article 275 ("in the cases not regulated by this Code") is an inaccuracy and can only mean that it is limited to cases not contemplated in the First Section of Chapter VIII. In its literal form, i.e. *ad peddem literae*, when it refers to the Code, it is contradictory to what is provided for in articles 260 and 262, which authorizes an *ample* application of international maritime usages.

Summing up, and for the purpose of being more precise in the criterion expounded, we have that the juridical norms applicable to work on Panamanian vessels in international trade, are the special legal norms (Section First, Chapter VIII), international maritime usages and certain general norms of the Code which may be necessary and, at the same time, compatible with the special nature of international maritime work. And there is no fixed order of priority between the first two groups of norms because in one specific case article 262 gives it preference but only in that specific case, to the international maritime usages which are more favorable than the vacation mentioned in article 262.

17. What are "maritime usages", "international maritime usages" or "international usages and customs" mentioned in articles 260, 262 and 275 of the Code? Here again the notorious lack of accuracy of the terminology of the Code is evident because in truth it meant to refer to "international maritime usages". The labor law of Panama did not define what was meant by those usages, but what the legislator of 1947 had in mind (article 130) as well as the legislator of 1971, was that in addition to the special provisions of the Code relative to the contract of seamen, there would be applicable the practices, customs, uses of international maritime commerce, including as part of those usages, the agreements or contracts of the crew with the captain of the ship (articles 263 and 264 of the 1971 Code).

The owners or operators of Panamanian ships in international trade being persons of diverse nationalities, what the Panama labor law has wanted to do is guarantee both the seamen as well as the owners the application of practices, usages (including the written contracts) to which they both were accustomed and which are not equal all over the world but, rather, they vary according to the class of vessels (general cargo, tankers, tourism, etc.), the various parts of the world where the vessels travel, and other similar situations. From this arises the fundamental importance of the agreements or contracts between the Master and the crew, called shipping Articles, in which these practices, customs and usages appear and which the Panamanian Code calls "international".

Both the special legal norms, and the international maritime usages have priority over the general norms of the Labor Code, and the latter only apply in an exceptional manner and only when they are compatible with the nature of maritime work.

18. All of what has been said above leads us to the conclusion that the *juridical regulation of the labor contracts* on Panamanian vessels in international trade, is a *closed juridical system* which cannot go beyond what is provided for in the Constitution (only the provisions of the articles of Title III, Chapter III applicable to labor contracts), and what is provided for in the Labor Code. Any other legal instrument which is outside of the Constitution and of the Labor Code, and from the material point of view inclusive, cannot be applied to seamen contracts on Panamanian vessels in international trade, *unless that legal in-*

*strument expressly provides for its application to said contracts.*

That *closed* juridical system which governs *contracts* for international maritime work, specifying the rights and obligations of the parties, is composed of the following juridical instruments:

a. The provisions of Title III, Chapter III of the Constitution which may be applicable to labor *contracts;*

b. Articles 251 to 276 of the Labor Code which are *legal norms* of a normative content per se, or by the terms of which there is authorized the application of international maritime usages (including the contracts with the crew), or because they authorize expressly the application of another provision of the Code (the case of Article 272 which directs application of *all* of Book II relative to occupational sickness and labor accidents);

c. The *general* provisions of the Labor Code on the subject of labor contracts, when it is necessary to integrate the legal norms relative to international maritime work, provided, however, that said *general* provisions are compatible with the provisions of Chapter VIII, Section First, of Title VII of Book I, with international maritime usages and with the nature of maritime work.

We reiterate that aside from what is provided for in the Constitution, and aside from what is provided for in the Labor Code, no other legal instrument can be applied to *contracts* of seamen on vessels in international trade, because the juridical regulation of those contracts is a closed juridical system as a natural result of what is expressly provided for in the Labor Code.

In effect, the Panama Labor Code of 1971 classifies the contract for international maritime work, as a *special contract* and relates same in Title VII, Chapter VIII, First Section of Book I, and to which contract there only applies the Constitutional norms and Legal norms mentioned in sections a), b) and c) of this point 18). The basis of this closed juridical system is enunciated in Article 251 of the Labor Code, which says:

"The relations between employers and workers on vessels engaged in the international service, are governed IN GENERAL by this Code and ESPECIALLY by the provisions of this SECTION".

It is not necessary to repeat all that has been exponded above with respect to the characteristics of the regulation of seamen's contracts for services on Panamanian vessels in the international trade, and we only have to reiterate that points 12, 13, 14 and 15 of this opinion has fully analysed which are the *general* norms of the Code which apply to said contracts.

The existence of this closed juridical system which emanates from the Labor Code itself, is a guarantee of juridical stability which the Panamanian law has granted to the parties in their labor relations on Panamanian vessels in international trade. Both employers and workers know, or are in condition of know beforehand, their rights, their obligations and the labor conditions legally in effect; they know what they have and know what economic terrain they are treading. The Panamanian law has endeavoured to avoid that the seamen's contract on Panamanian vessels in international trade should be saddled with obligations not provided for expressly by law, and that Panamanian or foreing courts should not establish obligations or rights beyond that provided for in the Constitution and the Code.

I should make the reservation that in this point I have referred to the normative regimen of seamen's *contracts,* but we are not saying that other parts of the Code, such as Book III (Collective Bargaining) are not applicable to the action or activities of the workers on Panamanian vessels in international trade. The seamen who work on said vessels may form unions and declare strikes, within the provisions of Book III; but these provisions do not apply to *contracts* as such, but rather they regulate union activity and strikes of the seamen. The closed juridical system we have referred to applies to the contracts of seamen, their rights, obligations and contractual conditions, whereas union and stoppage (strikes) activities are personal and group actions of the seamen, but they are

not contractual relations of which Article 264 requires they be in writing, in three copies on forms which, according to article 263, are furnished by the Panamanian authorities.

19. As a practising attorney in Panama since 1948, up to the present time, I am quite familar with the decisions of the Panama Supreme Court and with the decisions of other Appellate courts. Since in the labor relations of seamen on Panamanian vessels of international trade, those tribunals and the Supreme Court have issued a certain number—not very much, for sure—of decisions since 1947, it is necessary to clariffy that, in Panama, the principle of "stare decisis" does not apply. The law with respect to national jurisprudence (Law 86 of 1941) provides that three uniform decisions of the Supreme Court shall have what the law itself calls "probable doctrine" which the Court may change (Article 3). And there are cases in which the Supreme Court changes its previous opinions. Because of this, the value or juridical effect which a decision of the Supreme Court may have in matters of international maritime work is very relative and those decisions are not presented as being of obligatory compliance, as is the case in countries where the rule of "stare decisis" applies.

The change of opinion by the Supreme Court has been and is so possible, that even on decisions of Constitutional matters the Court has varied its former opinions, notwithstanding article 203 of the Constitution which provides that those decisions "are final, definitive and compulsory".

20. I have considered the above exposé as necessary in order to respond to the questionnaire which has been submitted since it gives an analysis of the Panamanian law applicable to vessels in the international trade, and said exposé will serve as a general basis for the answers to the questionnaire.

## ANSWERS TO THE SPECIFIC QUESTIONS POSED IN DOCUMENT OF 18 AUGUST (MINUTE ENTRY)

21. *Question 1.* What is the law of the Republic of Panama concerning the wages and overtime pay that must be paid to crew members employed on vessels registered in the Republic of Panama and engaged in international maritime commerce?

*Answers:* The law of the Republic of Panama relative to the payment of wages and overtime pay which must be paid to crew members on vessels registered in the Republic of Panama and engaged in international maritime commerce, are the wages provides for in Executive Decree N° 21 of 1982 (B/.0.59 per hour as minimum salary applicable to the crew contracted outside of the territory of Panama, equivalent to $0.59), and the overtime pay of 25% provided for in article 261 of the Labor Code; or such higher wages and rate of overtime pay as may be provided for in the contract signed individually by the crew members or in the Ship's Articles signed by all of the crew and the Master of the vessel.

Article 33 of the Labor Code does not apply to crew members of Panamanian vessels engaged in international trade for the reasons explained in points 14 and 15) of the "General Considerations" of this opinion.

22. *Question 2.* What is the law of the Republic of Panama concerning the payment of additional monetary benefits not considered wages, in particular the "Thirteenth Month" provided under Cabinet Decree N°221 of 1971, vacation, repatriation and Sunday/holiday pay to crew members who are employed on vessels registered in the Republic of Panama and engaged in international maritime commerce?

*Answer:* Since the question refers to four different points same will be answered separately.

A. *"Thirteenth Month"*. Cabinet Decree N°221 of 18th. November, 1971 established the "Thirteenth Month" as a "special bonus", which is not in the nature of "salary" since its first "whereas" clause states that it is "in addition to salary" and Paragraph 1st. of Article 3 provides that it is not subject to most of the legal taxes on wages, which was ratified in Article 3 of

Law N°17 of 27th. August, 1983 which amended Cabinet Decree N°221.

This Cabinet Decree was enacted *before* approval of the Labor Code on 30th. December, 1971, and it continues to be in effect in the form of a Cabinet Decree *separate from the Labor Code*, with modifications enacted by means of Law N°17 of 1983.

It is not necessary to make reference to the purpose of the "Thirteenth Month" which is to be paid in three installments (April, August and December), and especially to the purpose of the Second installment payable in August, which, by virtue of Cabinet Decree N°221, Decree N°22 of 18th. October, 1973, and Law N°15 of 31st. March, 1985, was paid in, successively to the Saving Bank, to the National Mortgage Bank and to Social Security. *The worker never received the second installment of the "Thirteenth Month" since 1972 up to 1983.*

Law N°17 of 22nd. August, 1983, directed that said second installment be delivered to the workers by the employers from 1984 onward. It is clear that in so far as concerns the complaint of Daniel Henry et al, in 1985, all those changes in legislation with regard to the general purpose of the "Thirteenth Month" and the specific purpose of the second installment, are immaterial since in August of 1984 that second installment was payable *to the workers* as well as the first and third. Daniel Henry et al are claiming rights for services rendered from 1984 onward, and for that year (1984) the second installment was also payable to the worker.

When applying Cabinet Decree N°221 and the Decrees and Laws regulating or amending same we run into the situation that the provisions of said Cabinet Decree N°221 and other instruments amendatory therof, are not within the framework of the text of the Labor Code but, rather that said Decrees and Laws have always been OUTSIDE the text of the Code; they are legal instruments DIFFERENT from the Code, which are to be found in Official Gazettes DIFFERENT to that which contains the Code since Cabinet Decree N°221 was enacted and published BEFORE the approval of the 1971 Code.

If we bear in mind that the aggregate of norms applicable to seamen's contracts is a *closed juridical system* as explained in point 18. of this opinion; and if Cabinet Decree N°221 of 1971 IS NOT PART OF THE LABOR CODE, then the conclusion is that the "Thirteenth Month" is not applicable to contracts of seamen on Panamanian vessels in the international trade.

Since the 1971 Code provides for the application of international maritime usage, it should be borne in mind that it is often provided in individual seamen contracts and in Shipping Articles of Panamanian vessels in international trade, to grant the crew *certain special bonuses*, in addition to wages and overtime pay. This fact also tends to show that Cabinet Decree N°221 is not applicable in those vessels since said special bonuses granted in the contracts would be very similar to the "Thirteenth Month". But the fundamental reason why Cabinet Decree N°221 is not applicable to maritime work on Panamanian vessels in the international trade has been fully explained above.

In this point we should consider that during the last few years the Supreme Court of Justice of Panama has granted to seamen on vessels in international trade, the "Thirteenth Month", as per the cases of *"Francisco Moreno de León and Edgardo Rangel vs. Texaco Panama Inc."* (decision of 28th. August, 1984), and *"Leonardo McDermott vs. Esso Tankers Inc."* (decision of 5th. December, 1984). But these two decisions do not favour the complaint presented by Daniel Henry et al against the S/S BERMUDA STAR et al, for the following reasons:

a) In the two decisions mentioned it is emphasized that the companies sued were Panamanian; that they were inscribed at the Public Registry Office of Panama and had a domicile in the Republic of Panama. In the decision of 28th. August, 1984 (Texaco), it is specifically stated that "the Panamanian Company, owner of the vessel, is sued"; and that "the owner of the vessel, which is a Panamanian corporation, is be-

ing sued" and that "it concerns a Panamanian worker contracted in Panama". In the decision of the 5th. December, 1984 (Esso) the following is stated: "In this connection the Division (Sala) considers that the companay involved is Panamanian, likewise the worker is Panamanian even though he was contracted to render services outside of the national territory".

It is evident that one of the fundamentals of the decisions of the Supreme Court is predicated on the theory that the defendant companies were Panamanians and that the plaintiffs were also Panamanian citizens.

In the case of Daniel Henry at al, it does not appear that the defendant is a Panama corporation, nor is it domiciled in Panama; nor does it appear that the plaintiffs are of Panamanian nationality.

b) In the two decisions referred to, the Supreme Court of Justice, in order to apply Cabinet Decree No. 221 of 1971 to Texaco Panama Inc. and Esso Tankers Inc. expounded the criterion that "nothing prevents, juridically speaking, that said Decree be *incorporated* as a legal norm *within* the Labor Code, as in effect was done by the Legislator in article 1064 of the Labor Code" (decision of 28th. August, 1984); and "the Division (Sala) expresses that said provision (article 1064, section 7 of the Labor Code) reiterates the standing of the Thirteenth Month, *incorporating* it to the Labor Code" (decision of 5th December, 1984). This was another one of the criteria used by the Supreme Court to apply Cabinet Decree No. 221 of 1971 to Panamanian vessels in international trade, in the two aforesaid decisions.—

This criteria is completely wrong because (article 1064 section 7) of the Labor Code only "maintains the standing of Cabinet Decree No. 221", but in no manner does it *incorporate* its text to the Code. It is not far-fetched to assume that the Supreme Court of Justice, in a future decision, will recognize such a flagrant juridical error of holding that article 1064 *incorporates* Cabinet Decree No. 221 into the Labor Code. We do not agree with such an error, even though it was expounded by the Supreme

Court of Justice, and we maintain that Cabinet Decree No. 221 *is not a part of the Labor Code, and was not incorporated into it.*

Cabinet Decree No. 221 of 1971, which establishes the "Thirteenth Month", and Cabinet Decree No. 252 of 30th. December, 1971, which adopts the Labor Code, are legal instruments of the same hierarchy, and since they were issued by the Provisional Government Junta when there was no parliament or National Assembly in Panama, they have been given the status of Laws. The Labor Code, by its (article 1064, section 7), *does not incorporate* Cabinet Decree No. 221 into the text of the Code but, rather, it limits itself to recognize a juridical fact, to state that said Decree shall continue in effect so that there should be no doubt. The norm says, textually "the standing of Cabinet Decree No. 221 is maintained".

The standing or effectiveness of a Law or a Decree consists in its juridical existence in time. To state that "the effectiveness is maintained" is equivalent to letting the record show a situation of the existence and enforceability of that Decree in order to avoid any doubts. Never can such a mention, such a reference as contained in article 1064, be interpreted in the sense that it *incorporates* Cabinet Decree No. 221 into the Labor Code.

From a juridical point of view, there was no necessity of the Labor Code saying that "the standing of Cabinet Decree No. 221 is maintained" since both document, Cabinet Decree relative to "Thirteenth Month" and Cabinet Decree adopting the Code, have the same juridical rank; in Panama, they have the effect of two Laws as if they had been issued by a constitutional legislative body. If a Law exists at the time that a new Law enters into effect, there is no legal necessity that the latter should declare that the former continues in force. What the Labor Code has done in (article 1064, section 7), speaking in practical terms, is say: Cabinet Decree No. 221 exists and is effective as such, and "its existence and standing is maintained". That was completely unnecessary since the

standing, that is to say the existence and enforceability of Cabinet Decree No.221 emanates from its own text and from the fact that it was published in Official Gazette No. 16,989 of 1st. December, 1971. From this latter date it became effective and had full effects without the necessity of another Decree or Law saying that said Cabinet Decree No. 221 had juridical effects. The norm contained in (article 1064, section 7) of the Labor Code to the effect that "the standing of Cabinet Decree No. 221 is maintained" is simply declarative and limits itself to recognizing that said Decree exists and has juridical effects. That declaration was made so that there would be no doubt that, in addition to what was provided for in the Code, Cabinet Decree No. 221 would continue to be applied.

We have said it and it is convenient to reiterate it: to say that "the standing of Cabinet Decree No. 221 is maintained" can never mean, nor have the effect of incorporating that Decree into the text of the Labor Code. In order for the Code to *incorporate* that Decree into its structure, its contents, it would have been necessary for the Code to have said: "Cabinet Decree No. 221 of 1971 is hereby *incorporated* into the Code", or something along those lines.

There is another way of incorporating a former Law into the text of a new Law, and that other form consists in *reproducing* the first Law into the text of the second. This latter system is the one most frequently used in Panama, and was followed by the 1971 Labor Code with certain provisions of the 1947 Code, especially with respect to the provisions applicable to contracts of seamen on Panamanian vessels in international trade. If articles 123 to 149 of the 1947 Code are reviewed, it will be seen that many of those provisions were incorporated, with slight modifications, to the 1971 Code in articles 251 to 276. Such is the manner of *incorporating* the text of a former Law into a new Law.

Another clear example of how the new Code *incorporated* into its text previous provisions, is shown in article 262 relative to vacations, as taken from Article 2 of Law No. 7 of 1950. Said provisions are reproduced hereunder, and it will be seen that in the new Code there are only slight variations:

"Article 1. (Law No. 7 of 1950). All the members of the crew of a vessel shall be entitled, after twelve months of uninterrupted service, to annual paid vacation, the duration of which shall be:

"a). In the case of captains and officers, not less than eighteen working days for each year of service.

"b). In the case of other crew members, not less than twelve working days for each year of service."

"Article 262. (1971 Labor Code). Without prejudice to more favorable international usages, all the members of the crew of a Panamanian vessel engaged in international commerce, shall be entitled, after twelve months of uninterrupted service, to annual paid vacation, the duration of which shall be:

"1.—In the case of captains and officers, as well as officers or radio operators, not less than eighteen working days for ecah year of service; and

"2.—In the case of other crew members, not less than twelve working days for each year of service."

In keeping with all that has been said in this point, and since Cabinet Decree No. 221 of 1971 WAS NOT INCORPORATED INTO THE LABOR CODE, in order for the Supreme Court of Justice of Panama to grant "Thirteenth Month" benefits to seaman on vessels in international trade who sued Texaco Panama Inc. and Esso Tankers Inc., it was imperative that the Supreme Court, in its decisions of 28th. August and 5th. December, 1084, should make statement, which is absolutely incorrect and violative of what is said in Article 1064, section 7) of the Code, that Cabinet Decree No. 221 *was incorporated* into the Labor Code.

The author of this Report (opinion), with all due respect toward the Supreme Court of Justice of Panama, maintains:

a) that the decisions of the Supreme Court only have effect as to the case or cases in which they are issued since, in

Panama, according to Law No. 86 of 1941, the rule of "stare decisis" is not applicable;

b) That the statement to the effect that Cabinet Decree No. 221 of 1971 was incorporated into the 1971 Labor Code by virtue of article 1064, section 7), as appears in the Supreme Court's decisions of August and December, 1984, is totally inaccurate and violative of the text of article 1064 which it purports to use as a basis;

c) That members of the crew of a Panamanian vessel engaged in international maritime commerce are not entitled to the payment of the "Thirteenth Month" because Cabinet Decree No. 221 of 1971 is not part ofthe juridical norms applicable to contracts of crew members on such vessels (Constitution and Labor Code) and because said Cabinet Decree No. 221 does not expressly say that it applies to said contracts.

B. *Vacations:* With respect to vacations, maritime work on Panamanian vessels in international trade is regulated by article 262 of the Labor Code the text of which says that there shall be applied more favorable international usages or the legal minimun of 12 an 18 days vacation "for each year of uninterrupted service". There is no right to fractional vacation for service periods less that a complete year.

Article 54 of the Labor Code, which provides for 30 days vacation for eleven continuous months of work does not apply neither is proportional vacation contemplated in section 6) of said Article 54 applicable.

Since the individual contract of Messrs. Daniel Henry et al provides for 14 and 15 days of annual vacation, they have no right to claim any additional pay for vacation over and above those 14 and 15 days.

C. *Repatriation:* The contracts signed by the crew of the S/S BERMUDA STAR it is provided that upon completion of the full period of the contract, the employer shall pay all repatriation expenses. It is thus stated in the contracts identified as Forms A and B. This clause is worded thus:

"On completion of the full terms of this agreement, the employer will furnish the employee with repatriation expenses to his/her country of origin".

It is clear that said contracts comply with the repatriation provided for by article 255 of the Code. In addition, when the crewmember complies with the term or period of his contract, he is reimbursed the deductions authorized in the contract for repatriation purposes, and by said reimbursement it becomes evident that the employer pays for the repatriation expenses. The affidavit of Capt. Jens W. Thorn (point 12) refers to this aspect, as follows:

"However, these monthly deductions (which are almost always less than 10 per cent of the monthly gross wage) are refunded in full to the crew member upon completion of his contract".

In these circumstances, in my opinion the plaintiffs Daniel Henry et al are not entitled to be paid by defendant any sum whatsoever as repatriation.

D. *Sunday and Holidays:* To establish if the plaintiffs are entitled to be paid additional sums for work on Sundays and days of National holidays, it is necessay to see what the criteria of the Code is on the subject.

In a concrete case of service on vessels, the 1971 Code refers to weekly rest days, national holidyas and overtime worked *on fishing and coastwise vessels.* On said subject, article 277 has the following solutions:

"6. For each day of weekly rest or national holyday worked during the voyage, the worker will enjoy one rest day on shore, as compensation, remunerated with a surcharge of fifty percent. Said rest shall be granted not later than before the beginning of the third trip.

"7. Each crew member shall be entitled to one additional rest day, with pay, on shore, for each eight days of service on board, which must be paid complete at the end of each trip, as total compensation for the overtime worked during same."

It is quite evident that the Code, in the case of fishing and coastwise vessels, drastically gets away from its general norms applicable to land work. This is inevitable

because of the special nature of work on vessels. Trips on fishing and coastwise vessels, in general, are of a short duration, and after a more or less short trip, the crew members returns to shore until the next trip is organized. That is why the Code grants the rights mentioned in points 6, and 7 hereinabove which set out a very special manner for payment of work on the vessel on Sundays, national holidays and overtime. What is important in these two provisions is that the general norms of the Code are not applicable.—

The other kind of work on vessels is that performed on vessels in international trade. A Code which regulates many details of that type of work, which contains specific norms relative to overtime (article 261) and vacations (article 262), does not refer specifically to work on Sundays and National holidays. Why? Here is where we find the reason for articles 260 and 275. The schedule and shifts are fixed by the Master "in accordance with maritime usage". And when the Code does not contemplate a specific aspect of maritime work, "there shall be applied the *international maritime* usages and customs, and international conventions on the subject".

In other words, the solution given by the Code for work on Sundays and National holidays, on Panamanian vessels in international trade, is to apply the international maritime usages, and not the application of the general norms of the Code which contemplates land-based work. Those maritime usages are generally reflected in the individual contracts and the Ship's Articles.

The conclusion is that plaintiffs Daniel Henry et al are not entitled to claim pay for work on Sunday and National holidays predicated on Articles 41, 45, 47, 48, 49 and 50 of the Labor Code, because these latter provisions, by their very nature, can only be applied to land-based work and not to Panamanian vessels in the international trade.—

Any work performed on said vessels during Sundays and National holidays are included in the norms regulating payment of wages and overtime contained in the individual labor contracts and the crew contracts (Shipping Articles), as is the case of the contracts signed by the crew of the S/S BERMUDA STAR.

23. *Question 3:* Are the contractual wages, overtime pay and benefits paid to the plaintiffs by the defendant proper under the law of the Republic of Panama?

*Answer:* After a careful review of the crew's contracts of the "BERMUDA STAR" and the wage, overtime and bonus sheets (summary of wages) paid to plaintiffs Daniel Henry et al (see exhibit to Affidavit signed by Prof. Luis A. Shirley), I have arrived at the conclusion that those payments are in accordance with the Panamanian law applicable to work on Panamanian vessels in the international trade, as explained in detail in this Opinion.—

Even in the case of those contracts of persons who ordinarily receive gratuities, in which there is shown a purely nominal wage; or in the case of contracts which contain a base wage in money for the payment of overtime, with no relation with the basic wages agreed to, it cannot be said that said contracts are illegal since the payment *effectively* made each fifteen days or each month is what determine whether or not compliance is being given to the Law applicable to contract of seamen on Panamanian vessels in international trade. The Panamanian law admits that gratuities have the status of wages.

In Labor Law what is importante is what occurs in the factual employer-employee relationshiph and the written contract is only a base or beginning of that relationship, so that in order to establish if the applicable Law is being complied with, for example, in matters relative to wages, overtime and other monetary benefits other than wages, it is necessary to take into account the amount of wages really and effectively paid the worker each fifteen days or each month.

When the labor contract shows a nominal sum as monthly wage; or a fixed per hour sum as a basis for overtime, with no relation to the monthly wage, it cannot be said that the worker is waiving the rights granted him by Law, nor can it be said that those contracts are illegal, since the impor-

tant thing is the amount of money really paid the worker; and taking into account the factual payment is the way to establish if the applicable Law has been complied with. Clauses of nominal wages and fixed amounts for overtime are included in many crew contracts and it is a custom or usage widely used.

In the specific case of plaintiffs Daniel Henry et al, the sums of money paid them semi-monthly or monthly, in accordance with the contracts, exceed the minimum wages and overtime rate established by Executive Decree No. 21 of 1982 ($0.59 per hour) and by article 261 of the Code (25%). There is, therefore, no *relevant* illegality in the crew contracts of the S/S BERMUDA STAR, when in truth and in fact the payments effected are above the legal minimums.

It is proper, at this time, to say that I consider the opinion of the Minister of Labour & Social Welfare, in his letter of 10th March 1986, a correct appraisal of the juridical regimen of crew contracts on Panamanian vessels in international trade, especially the following points thereof:

"7. In connection with the maritime usages and customs, this Ministry is cognizant, by virtue of communications from our Consuls abroad, that in keeping with usages and customs internationally observed, the contracts of crew and personnel on vessels in the international trade provide for a fixed "monthly wage and a rate of overtime which has no relation with the contractual monthly wage, but it is equal or exceeds the sum made up by the minimum common wage plus the 25% surcharge on said amount.

"9. The Ministry of Labour & Social Welfare accepts the validity of the clauses mentioned in point 7. in the case of contracts for service on Panamanian vessels in the international trade, in the case of seamen contracted abroad, provided that the remuneration which the crew member receives (whether it be called salary, overtime or any other monetary benefit) is not less that the salary to which he is entitled, applying the minimum wage of B/.0.59 per hour and the rate of 25% surcharge on said minimum salary as overtime effectively worked".

The foregoing opinion not only has the force of its intrinsic content, even though it discusses the points succinctly, but it also has the value of being the official administrative position of the Panamanian Government in labor matters. Our points of view, being the result of analyses made throughout the years, principally from 1972 to this date, we cite the opinion of the Minister of Labour & Social Welfare of the Republic of Panama because, essentially, it coincides with our position on the subject.

24. *Question 4:* "Are plaintiffs entitled under the law of Panama to any further payment of wages, overtime pay and benefits other than that which they have already received from defendant?

*Answer:* To answer this question we have not only taken into account the pleadings of the plaintiffs in this case and plaintiffs' Memorandum of Facts and Law, but also the services rendered by plaintiffs, some from 1984 and others from 1985.

My opinion is that the plaintiffs are not entitled, in keeping with the Law of the Republic of Panama, to any other payment of salaries, overtime or other monetary benefits additional to that which they have received from defendant company.

And I wish to take advantage of this last point of the questionnaire to say that the complexity of the juridical problems involved in the matter of applicable law to contracts of seamen on Panamanian vessels in international trade; the fact that several provisions of the Panama Labor Code of 1971 are not drafted with the accuracy of terminology which would have been desired; and the circumstance that I hold an opinion diametrically opposed to the Supreme Court's decisions of 1984, on the basis of fundamental juridical principles, all this, I repeat, has made it necessary for me to render my opinion in a rather extensive manner.—

Panama, November 17, 1986.

Respectfully submitted,

/s/ H.E. Ricord

Prof. Humberto E. Ricord
Special Master