**Daniel HENRY, et al.,
Plaintiffs–Appellants,**

v.

**S/S BERMUDA STAR, etc., et al.,
Defendants–Appellees.**

**Ramon Rodriguez ALVAREZ, et al.,
Plaintiffs–Appellants,**

v.

**BAHAMA CRUISE LINES, INC., et al.,
Defendants–Appellees.**

No. 87–3285.

United States Court of Appeals,
Fifth Circuit.

Jan. 26, 1989.

---

Robert A. Kosseff, Philadelphia, Pa., for Henry, et al.

Sidney H. Kalban, New York City, Stevan Dittman, New Orleans, La., for Alverez, et al.

Christopher O. Davis, New Orleans, La., for defendants-appellees.

Before BROWN, JOHNSON, and HIGGINBOTHAM, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

As an interlocutory appeal from the Eastern District of Louisiana,[1] this case presents questions regarding the interpretation of Panamanian law. *Henry v. S/S BERMUDA STAR*, 663 F.Supp. 1226, 1987 A.M.C. 1377 (E.D.La.1987). We affirm in part, reverse in part, and remand this case to the District Court for further consistent proceedings.

The plaintiffs in the instant case are some 139 seamen employed on board the S/S BERMUDA STAR by the defendant Bahama Cruise Lines, Inc., a Liberian corporation (now known as Bermuda Star Line, Inc.). The S/S BERMUDA STAR is registered under Panamanian law. The BERMUDA STAR cruises out of New York harbor in the spring and summer and out of New Orleans in the fall and winter. In November 1985 one group of seamen, the "Henry" plaintiffs, sued Bahama Cruise Lines in New Orleans claiming that they had not been paid fully under Panamanian law. In July 1986 another group of seamen, the "Alvarez" plaintiffs, sued in the District Court in New York for the same reasons. The New York suit was transferred to the Eastern District of Louisiana in August 1986 and the two cases were formally consolidated on October 16, 1986.

All the parties agree that Panamanian law applies to the labor relationship between the plaintiff seamen and the defendant employer. On August 20, 1986, the District Court appointed a special master, Dr. Humberto Ricord,[2] to aid the court in

---

1. By administrative order this court declined as unnecessary to grant leave to appeal under 28 U.S.C. § 1292(b) since the District Court order is appealable under § 1292(a)(3) as one determining rights and liabilities in admiralty cases.

2. Dr. Ricord holds a Bachelor of Law degree from the University of Panama and masters and

determining foreign law.[3]

Although the Alvarez plaintiffs disagree with many of the conclusions of the Special Master, they have never formally objected to the master himself. Dr. Ricord's report to the court essentially agreed with the defendant shipowner's interpretations of Panamanian law.

The District Court postponed the accounting calculations to determine whether as to each seaman plaintiff the amounts actually paid corresponded to those due under Panamanian law until completion of the seamen's interlocutory appeal. Since Fed.R.Civ.P. 44.1 states that determination of foreign law constitutes "a ruling on a question of law," we engage in *de novo* review of the District Court's determination.[4]

### Convenient or Inconvenient Forum?

■ We have decided that under existing circumstances it is inappropriate to invoke *forum non-conveniens* dismissal. The BERMUDA STAR has substantial, regular contacts with the United States, and almost no ties, other than its registry and contractual choice of law, with Panama. Moreover, both parties have already devoted considerable time and resources to the litigation in this country. Because the BERMUDA STAR is of Panamanian registry and because this labor dispute is governed by Panamanian law, we asked the parties to submit post-argument briefs addressing whether the case should be dismissed pursuant to the doctrine of *forum non conveniens* on the ground that Panama provides the more appropriate forum. Since both parties opposed dismissal, we need not determine whether under *Gulf Oil Corp. v. Gilbert*[5] and *Piper Aircraft Co. v. Reyno,*[6] such dismissal is available or appropriate.[7] Nor do we engage in the comparative analysis between private and public[8] factors.

### Does the Panamanian Labor Code Go to Sea?

We agree with Special Master Ricord that Chapter VIII, division 1 of the Republic of Panama Labor Code[9] governs the relationship between the parties in this case. Our first recourse is, therefore, to these "specific provisions" of the Labor Code unless a specific provision expressly directs us to give preference to international maritime custom and usage.[10] Despite the Special Master's correct emphasis on the specific provisions of the Labor Code, we disagree with the Special Master's ultimate resolution of the formula for calculating overtime. Therefore, on the remand of this case to the District Court for calculation of specific sums, the formula established in this opinion must be used. The District Court, with the assistance of a

doctorate degrees from Universidad Nacional Autonoma de Mexico. A former labor law professor and dean of the faculty of law at the University of Panama, Dr. Ricord has practiced law in Panama since 1948. His extensive experience includes serving as Counsellor at Law with the Port Authority, The National Panama Council and the Office of the President of the Republic. He has previously served as a special master in the Second and Eleventh Circuits.

3. Pursuant to Fed.R.Civ.P. 44.1.

4. *See generally* 9 C. Wright & A. Miller, *Federal Practice & Procedure* § 2446 (1971 & 1988 Supp.); Brown, *44.1 Ways to Prove Foreign Law,* 9 Mar. Law. 179 (1984).

5. 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055, 1062 (1947).

6. 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981).

7. *See also Gonzalez v. Naviera Neptuno A.A.,* 832 F.2d 876, 878 (5th Cir.1987).

8. Those public factors include: the interest in not burdening court dockets and resources with matters unrelated to their respective fora, a desire to resolve local disputes "at home," and the interest in avoiding problems normally associated with the application of foreign law. *Gilbert,* 330 U.S. at 508–09, 67 S.Ct. at 843, 91 L.Ed. at 1062–63; *Gonzalez,* 832 F.2d at 878.

9. Pan. Labor Code Arts. 251–76. In our analysis, we have relied on the translation supplied by the parties: *Labor Code of the Republic of Panama* (Substantive Provisions) (J. Fabrega trans. 1974). References throughout this opinion will be to that translation.

10. *E.g.,* Pan. Labor Code Art. 262 ("[w]ithout prejudice to favorable international maritime usages").

fact-finding special master if it sees fit, must decide once and for all whether the wages and benefits paid to the seamen were proper.

## I. The Master Speaks

We begin with a summary of the Report of the Special Master, adopted by the District Court as part of its Order & Reasons granting partial summary judgment for Bahama Cruise Line.[11] The Special Master was requested to determine the following issues:

1. What is the law of the Republic of Panama concerning wages and overtime pay that must be paid to crew members employed on vessels registered in the Republic of Panama and engaged in international maritime commerce?

2. What is the law of the Republic of Panama concerning the payment of additional monetary benefits not considered wages, in particular the "Thirteenth Month" provided under Cabinet Decree No. 221 of 1971, vacation, repatriation and Sunday/holiday pay to crew members who are employed on vessels registered in the Republic of Panama and engaged in international maritime commerce?

3. Are the contractual wages, overtime pay and benefits paid to the plaintiffs by the defendant proper under the law of the Republic of Panama?

4. Are plaintiffs entitled under the law of Panama to any further payment of wages, overtime pay and benefits other than that which they have already received from defendant? [12]

## Minimum Wages & Overtime [13]

The parties seem to agree that Panamanian law dictates a rate of 0.59 *Balboas* (B/0.59) [14] per hour as the minimum salary for crew members contracted outside the territory of Panama. They also agree that the hourly overtime rate for minimum wage is calculated at (minimum wage × 1.25).[15] The parties dispute whether an overtime rate of (minimum hourly wage × 1.25) is acceptable under the Labor Code where the crew member's contract provides a monthly salary with a base hourly wage greater than the minimum hourly wage.

The Special Master concluded that the wages paid were proper.[16] He found that in determining the legality of a wage under the Labor Code, the starting point is not the contractually established minimum wage, but the actual amount paid each crew member. If the actual wage exceeded the statutory minimum, there was no illegality in the employment contract.

## Thirteenth Month

The Special Master concluded that the Thirteenth Month bonus was not applicable to members of the crew of a Panamanian vessel engaged in international maritime commerce.[17] The Thirteenth Month bonus

**11.** 663 F.Supp. 1226, 1987 A.M.C. 1377 (E.D.La 1987). The Special Master's report appears in full at 663 F.Supp. at 1230–43 (App. A).

The plaintiff seamen argue that the grant of partial summary judgment against them by the District Court was improper because issues of fact existed with respect to a determination of international maritime custom and usage. This argument fails because determination of foreign law is a question of law not fact. Fed.R.Civ.P. 44.1. Thus, Fed.R.Civ.P. 56 does not make summary judgment inappropriate. *See generally* 9 C. Wright & A. Miller, *supra* at § 2444.

**12.** 663 F.Supp. at 1227, 1987 A.M.C. at 1378–79.

**13.** *See* 663 F.Supp. at 1241–42.

**14.** B/1 = U.S. $1. The U.S. dollar is legal tender in Panama.

**15.** This would set the minimum overtime rate for a seaman at $0.74/hour.

**16.** 663 F.Supp. at 1241. While Special Master Ricord was expressly instructed not to perform mathematical calculations in order to determine whether a particular plaintiff had received all amounts due, Ricord was nonetheless somehow able to conclude that the payments made exceeded the legal minimums. We acknowledge his predicament—especially given his interpretation of Panamanian law—of addressing the District Court's question as to whether the wages were "proper" while dutifully refraining from the money or quantitative analysis.

**17.** *Id.* at 1236–40.

was established by a Cabinet decree [18] prior to the enactment of the Labor Code and continues in effect as a law separate from the Labor Code. Consequently, the Thirteenth Month bonus is not a part of the Labor Code and is not applicable to contracts governed by the Code. The Special Master concluded that the Cabinet decree did not apply of its own force to seamen's contracts and the seamen were not entitled to a Thirteenth Month bonus.

### Vacation Time

The individual contracts of the seamen provide for 14 or 15 days of annual vacation. Special Master Ricord concluded that under Article 262 of the Labor Code the crew members are entitled to a minimum of 12 days of vacation "for each year of uninterrupted service." [19] Since the individual contracts provided for annual vacation in excess of the legal minimum, the Special Master found no basis for a claim to additional pay for vacation over and above the amount provided in the contract. He also found no basis for pro rata vacation payments to seamen who had served for less than one year.

### Repatriation [20]

Special Master Ricord next addressed the issue of repatriation costs. The contracts (Forms A and B) signed by the non-gratuity earning crew members of the S/S BERMUDA STAR provided that the shipowner would pay repatriation expenses upon completion of their contracts. The Special Master determined that these provisions which furnish the seamen with repatriation expenses to their respective countries of origin fulfill the shipowner's repatriation obligation under Article 255 of the Labor Code.[21]

During the course of his contract, each crew member—gratuity or nongratuity earning—had his wages diminished by a monthly deduction for repatriation in the event the crew member left the vessel before the end of the voyage or was dismissed for cause. However, upon completion of a seaman's contract, the shipowner reimbursed the withholding from his wages [22] and thus evidently also covered the repatriation expenses as legally and contractually required. According to the Special Master, the employer has shouldered the burden of repatriation as required by the Labor Code.

### Sunday and Holiday Pay

The Special Master next determined that the seamen were not entitled to additional pay for work on Sundays and national holidays. Special Master Ricord [23] based this conclusion on the fact that Article 260 of the Labor Code permits the master to schedule and fix the shifts of seamen "in accordance with maritime usage." The Special Master concluded that the general provisions of the Labor Code which provide for pay for work on Sundays and national holidays apply only to land-based workers, not to workers on fishing and coastal vessels, or on Panamanian vessels in international trade. Finding no maritime usage reflected in the seamen's contracts or ship's articles to support the seamen's position, he decided the seamen had no valid claim to a special overtime pay rate for Sunday or holiday work.

## II. Lessons In Civil Law
### (i) Civil Law 101: Introduction to Methodology

To completely understand the issues with which we are faced and our analysis, it is first helpful briefly to explain the nature of Panamanian law. Panama's legal system is civilian in nature. The primary source of law is legislation, not judicial decision—as is true in common law systems. In prac-

18. Cabinet Decree No. 221, Nov. 18, 1971.

19. 663 F.Supp. at 1240.

20. *Id.*

21. The Special Master did not analyze the status of gratuity earning crew who were not paid repatriation expenses to the country of their origin. These crew members had signed contracts identified as Form C or Agreement C.

22. Affidavit of Captain Jens W. Thorn.

23. 663 F.Supp. at 1240–41.

tical terms, civilian jurists must turn first to enacted statutes as superior sources of law. Only when no legislation controls an issue are lawyers and judges entitled to look elsewhere for solutions to legal problems. Judicial decisions as a class are merely persuasive authority to be used only when neither legislation nor custom provide a rule of decision. Stare decisis as it is known in common law is rejected by the civil law tradition. Judicial decisions are law only to the extent they either fill in the gaps left by legislation and custom or establish custom.[24]

### (ii) Civil Law 301:

### Panama Labor Code:

### Vessels in International Service

Division I of Chapter VIII of the Panamanian Labor Code covers the BERMUDA STAR, a vessel in international service. The parties agree that specific provisions in this section govern the mutual rights of employers and employees in this case and cannot be waived.

If those specific articles are not applicable or leave gaps in coverage, we must follow the statutory directive of Article 251 and look next to the general provisions of the Labor Code.[25] In the event that an issue is not covered by the Labor Code, Article 275 and traditional civilian concepts instruct us to apply international maritime practices and customs.[26]

Special Master Ricord treated the special provisions of Chapter VIII and international maritime usages as both taking priority over the Code's general provisions. While there may be doubts, which we do not resolve, as to whether this approach is consistent with the mandate of Articles 251 and 275 (notes 25 and 26 *supra*), our resolution of the issues requiring interpretation does not turn on whether international maritime usage prevails over the general Labor Code sections.

### (iii) Civil Law 501:

### Practicum
### *Overtime*

Article 261 of the Labor Code provides in pertinent part:

All members of Panamanian vessels engaged in international service, whose effective work time exceeds the legal limits or less because of contractual clauses, shall be entitled to be paid overtime with a surcharge of not less than 25% of the *wages accrued.*

(Emphasis added.)

■ The parties agree that the Panamanian minimum wage for these seamen is B/0.59.[27] The employment contracts

24. *See* Merryman, *The Civil Law Tradition* 22–23 (2d ed. 1985); Yiannopoulos, *Louisiana Civil Law System* 45, 51–56 (1977) ("in civil law jurisdictions, popular uninterrupted acquiescence in a long line of precedents *may* establish rules of customary law; in common law jurisdictions judicial precedents represent a judge-made law.") (emphasis added).

The seamen's legal expert, Irma Crespo de Arias, explained the use of case law in this case as follows:

The decisions of the Supreme Court of Justice can constitute a "probable doctrine" as according to the Labor Code three decisions by the Supreme Court constitutes "probable doctrine." Decisions of the Supreme Court of Justice on issues of constitutionality of statutes are binding precedent regarding the statute ruled upon.

25. Article 251 reads: "The relations between employers and workmen on ships which are devoted to international service, are governed in general by this Code and especially by the provisions of this section."

If the general and specific provisions conflict, Pan. Civil Code, Chapter III, art. 14 sets forth the following rules of construction:

1) A provision relative to a special case or particular matters or cases shall be preferred over a provision having a general character.
2) If the relative provisions should be specialized or general in the same manner and contained in the same code, there shall be preferred the provisions contained in the following article; and if they should be contained in different codes or laws, there shall be preferred the provisions of the special law or code on the matter at issue.

26. Article 275 provides: "In cases not regulated by this Code, international maritime practices and customs shall be applied as well as international agreements on the matter."

27. *See* Cabinet Decree No. 21, Art. 1(a) (1982) (establishing minimum wages throughout Panama). Hereafter when we use the term minimum wage, we are referring to the minimum wage as set by this Cabinet Decree.

signed by the seamen provide for a fixed monthly wage [28] and a fixed overtime rate (usually $0.75/hour but sometimes more). The parties dispute the formula to be used to determine the overtime rate. The shipowner claims the formula is: *hourly minimum wage $\times$ 1.25*. The seamen counter with the equation: *base hourly wage $\times$ 1.25 = overtime hourly wage rate*. Contrary to the view of the Special Master,[29] we agree with the seamen.

The shipowner's reading of Article 261 which bases the calculation of overtime on the legal minimum wage ignores the language "wages accrued." For its approach, the shipowner draws respectable authority from two district court cases.[30] However, those decisions, plus the interpretative opinions of the Ministry of Labor and Social Welfare, the Special Master Ricord's Report, and the legal "experts" in our instant case—all either ignore its existence or fail to explain how to read the term "accrued wages" in Article 261 to mean minimum wages.

The Special Master and the Minister of Labor and Social Welfare skirt this problem of statutory construction by consulting international maritime custom and usage. We view this approach as unwarranted given the applicability of a specific Labor Code provision, Article 261, to the issue of overtime pay.

The seamen correctly assail the reasonableness of interpreting Article 261 so that an overtime wage rate could be *lower* than a crew member's base hourly wage rate. The Labor Code does not contemplate such an anomaly, nor are we in a position to consider whether international maritime custom would do so.

Finally, the assertion that the Panamanian legislature intended that crew members would receive no overtime payments unless their wages fell below the minimum hourly and overtime wages has no merit. The specific provision of Article 261 sets forth the standards for overtime paid to hourly wage seamen as well as those on contracts. The 25% surcharge is on the "wages accrued." No reference is made—nor, within the limits of civilian doctrine, can one be reasonably inferred—to the minimum wage.

Having determined that the overtime rate is calculated at *base hourly wage $\times$ 1.25*, we must plunge into virgin waters—unentered by the Special Master—and determine whether a seaman has a right to payment of overtime for work done during his regular watch as set by the ship's master pursuant to Article 260.[31] The parties agree that the standard workweek set by the shipowner was 48 hours: 8 hours per day, 6 days per week.[32] The overtime clock started to tick when a seaman worked in excess of any of his six weekly 8-hour watches. Under the BERMUDA STAR's practice of compensation, overtime could result from working (i) either longer than, or outside of, the seaman's standard 8-hour watch (ii) by working an additional (7th) watch, or both.[33]

The seamen in interpreting Article 261's mandate that overtime must be paid when a seamen's "effective work time *exceeds the legal limits*" (emphasis added), direct us to turn to general Labor Code provi-

---

**28.** The seamen's related contention that Panamanian law does not permit a fixed-sum monthly wage is without merit. *See* 663 F.Supp. at 1241–42.

**29.** *Id.* at 1236, 1242.

**30.** *Vinuela v. S/S "BRITANIS"*, 647 F.Supp. 1139, 1145, 1987 A.M.C. 546 (S.D.N.Y.1986); *Cartagena v. Challenger Columbia, Inc.*, 685 F.Supp. 405, —— A.M.C. —— (S.D.N.Y.1988).

**31.** Article 260 provides:
It lies within the exclusive jurisdiction of the master to specify the hours of work and watches, in accordance with maritime usage, without prejudice to the authorities in that field intervening whenever the vessel is in port, in order to apply the principles and provisions of social justice infringed.

**32.** Oddly, the ship's articles, specifically paragraph 19, states:
[e]ight hours per day shall constitute a working day while in port or at such times when regular watches are not kept.

**33.** *See* later discussion on Sunday and holiday pay.

sions.[34] These legal limits, according to the seamen, vary depending on whether a crew member works a day, night, or mixed watch.[35] Application of the seamen's position would result in crew members who work the so-called night and mixed shifts having a right to overtime pay either an hour or one-half hour before the conclusion of their 8–hour watches.[36]

■ Using the mechanics of civilian statutory construction, we conclude, as have other United States courts,[37] that Article 260 not only grants the ship master the right to set the length of the watch, but also sets the watches as the "legal limits" on work at the standard pay rate. Under the civil law approach, a specific provision (here Article 260) prevails when in conflict with a general provision.[38] The conflict in this instance is the hodgepodge which would be created by granting the master authority to set the length of watches for the purpose of operating the vessel, yet taking away that authority when setting the "legal limits" of watches which seamen can work for standard (not overtime) pay.

We reject the seamen's argument that Articles 30 and 31 control. The specific provision of Article 260 supercedes the general provisions of Articles 30 and 31. Thus the latter's distinctions among day, night and mixed shifts are inapplicable to determining when a seaman working on a vessel in international service is entitled to overtime pay.

In sum, overtime must be paid at an hourly rate of *base hourly/wage* $\times$ *1.25* for work done outside of,[39] or after, regular watch hours. We, therefore, leave calculation of overtime to the District Court based on these standards.

### Sunday and Holiday Pay

The seamen argue that the general provisions of the Labor Code require the shipowner to pay them at higher rates for Sunday and holiday work.[40] Article 46 of the Labor Code entitles workers to one day of rest per week. This day usually is a Sunday unless the employer and employee agree upon a different day. If an employee is forced to work on his normal day of rest (i.e. Sunday or an agreed upon alternative), Article 48 stipulates that he is to receive 50% extra pay and another day of rest. If he is forced to work on the alternate rest day, that day is to be paid as a Sunday. (Article 48) In addition, the worker must receive 50% extra pay for work on Panamanian holidays.

In correctly denying the seamen higher pay rates/bonuses, penalties and succes-

---

**34.** Pan. Labor Code arts. 30–31.

**35.** Article 30 divides a work day into two shifts: (i) the 6:00 a.m. to 6:00 p.m. day shift and (ii) the 6:00 p.m. to 6:00 a.m. night shift. If work overlaps both the day and night shift, it is called a mixed shift.

The *maximum duration of a shift depends on* which type of shift is worked. According to Article 31, overtime payments must commence once an 8–hour day shift, 7–hour night shift or 7.5–hour mixed shift is completed by a worker.

**36.** Under uncontradicted customary maritime practice, the master establishes a work day of three watches, each eight hours in duration. The following are hypothetical applications of the seamen's methodology using 8–hour watches:

*Worker A (4AM–NOON watch)*
This watch would constitute a mixed shift: 4AM–6AM falling within the night shift and 6AM–NOON within the day shift. Worker A would have a right to overtime pay for all work performed after 11:30 AM.
*Worker B (NOON–8PM watch)*
This watch also overlaps both the day and night shifts of Article 30. Therefore, Worker B works a mixed shift and is entitled to overtime pay for all work performed after 7:30PM.
*Worker C (8PM–4AM watch)*
This watch falls completely within the night shift hours. Worker C thus has a right to receive overtime pay for all work done after 3AM.

**37.** *See Vinuela supra; Cartagena supra.*

**38.** *See* n. 25 *supra.*

**39.** Work outside of regular watch hours would consist of a 7th watch or part thereof worked in a week. The shipowner set the standard workweek at 48 hours: six 8–hour watches. Thus, as discussed in the context of Sunday and holiday pay *infra*, a seventh 8–hour watch must be paid at the overtime rate. The 48–hour limit on the workweek was also recognized in *Vinuela* and *Cartagena, supra.*

**40.** *See* Pan.Labor Code Arts. 40, 41, 47–50.

sive off days of rest for Sunday and holiday work, the Special Master turned to two sources: Articles 260 and 277 of the Labor Code. First, the Special Master resorted to division 2 of Chapter VIII of the Code which regulates fishing and coastal vessels. Within that division, Article 277 sets forth a special version of the Sunday and holiday pay rules. This approach demonstrates the Code drafters' recognition that the special nature of work on the high seas requires a different approach to Sunday and holiday pay.

■ Turning back to division 1—of the same Chapter VIII—which covers vessels in international service, the Special Master properly concluded that the drafters provided for special—in other words, different from the general labor code provisions—treatment of Sunday and holiday pay within Articles 260 and 261. By enabling the master to set the watches for the seamen "in accordance with maritime usage" (Art. 260) and providing overtime pay (Art. 261), the Labor Code provides a specific payment structure for all wages to be paid to workers on vessels in international service. *See Vinuela supra.*

The Special Master correctly extends the master's statutory authority to schedule hours of work and watches according to international maritime custom and usage to include Sunday and holiday work.[41] In the instant case, neither the contracts nor the ship's articles mention pay rates other than base salary and overtime. These agreements do not contemplate the payment of Sunday or holiday wages at rates different from either the base rate or regular overtime rate—whichever is applicable for a crew member during a given week. The seamen also give no evidence that international custom or practice requires that special Sunday and holiday rates be applied.

Equally important, and perhaps even more important—since it relates to common

sense which a common law court need not abandon in wrestling with the civil law—is the impossibility of carrying out the technical rules applicable to land-based activities. The Code prescribes no work normally on Sunday and if worked, another day off—a day of rest—must be accorded. And if the employee is required to work on the alternative day of rest, that day is considered as being a Sunday for penalty pay. The result would be that for an ocean-going vessel with a normal complement of 42 (three watches of 14 crew members), it would require a complement of not less than 56.

In conclusion, we find that Articles 260 and 261 control this issue and preclude resort to the general provisions of the Labor Code. Sundays and holidays have no special significance for purposes of pay, and therefore, are appropriately paid either at standard wage rates or, if work amounts to a seventh watch, at the appropriate overtime rates.

### Vacation Time and Pay

Article 262(2) of the Panamanian Labor Code requires crew members be given 12 days of paid vacation per annum. The contracts in the instant case provide for 14–15 vacation days for the plaintiff seamen who are all classified as crew members under Article 262. Thus, the vacation provisions of the contracts conform to the specific Code requirements insofar as the number of vacation days allowed.

The seamen, however, argue that (i) they are entitled to pro rata vacation for service of less than 12 months, and (ii) their vacation pay should include gratuities as well as such overtime pay as we have allowed.

■ With respect to the first (i) contention, the specific language of Article 262 grants vacation only "after twelve months of uninterrupted service." While this statutory provision appears to create no em-

---

**41.** We are not persuaded by the seamen's use of *Bassis v. Universal Line S.A.,* 322 F.Supp. 449, 1970 A.M.C. 1073 (E.D.N.Y.1970) *aff'd* 436 F.2d 64, 1971 A.M.C. 328 (2d Cir.1970) that Sunday and holiday pay must be treated differently than overtime. *Cf. Vinuela, supra. Bassis* was decided under an earlier statutory version of Pan-

ama's labor law. We do not have sufficient evidence to convince us that the earlier Labor Code structure is so similar to the current Code that the reasoning in *Bassis* is sounder than that of the Special Master, the *Vinuela* court and our own independent analysis. In the interest of finality we adhere to our analysis.

ployer obligation to give pro rata vacation days for service of less than a year, it is prefaced with the language "[w]ithout prejudice to favorable international maritime usages." The Special Master, as did the courts upon which the shipowner relies, made no reference to this "without prejudice" language when considering whether seamen with less than one year of service have a right to pro rata vacation pay.[42] No provision of the Labor Code—general or specific—sets forth a formula for vacation pay. Article 262 governing the length of paid vacation leave is silent with respect to remuneration payable to the seamen while on vacation.

The only expert in the instant case to conclude that pro rata vacation payments are required under the Code was the legal advisor to the Labor Minister. But neither he nor the seamen have cited any specific favorable international maritime practice to support the interpretation that pro rata payments be made. Thus we conclude that the seamen are not entitled to pro rata vacation days.

■ Turning to the second (ii) contention, we decline to answer whether and to what extent gratuities [43] and overtime pay are to be considered in the calculation of vacation pay. We conclude that the District Court will have to determine what constitutes vacation pay in the first in-

stance on remand since we lack the benefit of the trial court's and Special Master's views [44] and thorough treatment of the issue in the briefs.[45] We caution that the remand of this specific issue should not hold up the accounting proceedings of the other claims since this is a particular matter which can be isolated and treated separately in any appeal forthcoming from the really final, final judgment.

### Thirteenth Month Bonus

Seamen contracted under "Agreement A" had the following clause in their contracts:

> On completion of 12 months *satisfactory service*, the employee will receive *one month basic salary* as a bonus." (Emphasis in contract reproduction.)

But seamen under Agreements B and C claim that they too are entitled to a thirteenth month bonus.

Cabinet Decree No. 221 of 1971, enacted prior to the Labor Code, granted Panamanian workers the equivalent of one extra month's pay per year to be paid in three installments in April, August, and December of each year. This Decree, although still in force, has not been expressly incorporated into the Labor Code. The seamen claim that two Panama Supreme Court of Justice decisions [46] and a First Labor Court

---

**42.** *See Vinuela supra; Markakis v. S/S VOLENDAM,* 475 F.Supp. 29, 31, 1979 A.M.C. 1735 (S.D.N.Y.1979). The Special Master in his general discussion of the Labor Code states that international maritime usages more favorable to the vacation provisions in Article 262 are to prevail, but he does not apply this in his analysis of the seamen's argument for pro rata vacation. *See* 663 F.Supp. at 1234, 1240.

**43.** We point out that the inclusion of gratuities in some form as part of vacation pay would necessitate that tips/payments made by passengers be attributed to the shipowner.

**44.** *See* 663 F.Supp. at 1242.

**45.** On interlocutory review we could simply determine that the trial court's failure to rule would constitute an implied holding to the contrary. But since our role is to review, not initially decide, we think it best that this function be left to the District Court on remand. 28 U.S.C. § 2106. Perhaps of some significance

will be Article 140 of the Labor Code which defines wages as:

> the renumeration which must be paid by the employer to the workman by virtue of the labor relationship, which includes not only what is paid in cash and in kind, but also the ex gratia payments, benefits, bonuses, premiums, commissions, share in the profits and any other income or benefits that the workman receives on account of his work and as a consequence of same.

Only by incorporating overtime pay into the "other income or benefits" catchall provision of Article 140 could those additional payments be deemed wages. Yet the amount of an overtime payment is a percentage of the base wage, and thus overtime could hardly be part of the class of payments constituting the base wage.

**46.** *Francisco Moreno de Leon v. Texaco Panama, Inc.* (Pan. S.Ct. Aug. 28, 1984); *Leonardo McDermott v. Esso Tankers, Inc.* (Pan. S.Ct. Dec. 5, 1984).

case [47] command us to hold that the seamen are entitled to thirteenth month pay under this Decree. The Supreme Court of Justice cases held that Panamanian shipowners were obligated to give Panamanian seamen thirteenth month pay. This result could only be accomplished by effectively incorporating Cabinet Decree No. 221 of 1971 into the Labor Code.

The Special Master rejected the Supreme Court of Justice's conclusion that Article 1064, § 7's provision that "[the Labor Code] maintains the standing of Cabinet Decree No. 221" and serves to incorporate the thirteenth month bonus into the Labor Code.[48] In language [49] which a common law lawyer (or judge) would consider audacious, if not disrespectful, but which we may assume is in keeping with at least Central American civilian tradition, he criticized the Supreme Court of Justice for construing Article 1064 as incorporating this Cabinet Decree.

Furthermore, the Special Master distinguishes the Supreme Court of Justice cases from the instant case on the grounds that the BERMUDA STAR is not owned by a Panamanian company, nor are the seamen who seek thirteenth month pay Panamanian. This is critical because the express language of the Supreme Court of Justice decisions limits application of thirteenth month pay to *Panamanian* seamen.[50]

The seamen contend that *Felix Javier Herrara v. Texaco Panama, Inc.,* a case of the First Labor Court, renders the Special Master's distinction meaningless. The First Labor Court held in that case that a

Panamanian flagship—regardless of the shipowner/employer's nationality and place of incorporation—is subject to Panamanian labor law and the thirteenth month pay requirement.

▇ It is evident to us that the key issue is whether Cabinet Decree No. 221 is incorporated into the Labor Code. Were we a United States court applying United States law, we would be inclined by the authority cited by the seamen to hold that the Decree has been incorporated. But, we sit as a United States court applying Panamanian law within the constraints of a civilian law system. Under our understanding of the probable doctrine (n. 24, *supra*) without three judgments of the same court mandating incorporation of Cabinet Decree No. 221—thus the thirteenth month pay provision—into the Labor Code, we are directed to return to the text of the Labor Code. The express provisions of the Code and the Special Master's analysis lead us to hold that the thirteenth month pay bonus is not incorporated into the Labor Code. Until a third Supreme Court of Justice decision incorporates the Cabinet Decree into the Labor Code or the Code is amended to achieve this incorporation, the thirteenth month pay bonus does not apply to seamen on vessels in international service such as the BERMUDA STAR.

### Repatriation

Confusion arises in this section because the term "repatriation" has been used loosely throughout the course of this cruise

---

**47.** *Felix Javier Herrara v. Texaco Panama Inc.,* (First Labor Court, Mar. 17, 1988).

**48.** 663 F.Supp. at 1236–40. The Special Master specifically stated:

The norm contained in (article 1064, section 7) of the Labor Code to the effect that "the standing of Cabinet Decree No. 221 is maintained is simply declarative and limits itself to recognizing that said Decree exists and has juridical effects. . . .

. . . [It] can never mean, nor have the effect of incorporating that Decree into the text of the Labor Code. In order . . . [to do so] it would have been necessary for the Code to have said: "Cabinet Decree No. 221 of 1971 is hereby *incorporated* into the Code, or something to that effect."

*Id.* at 1239.

**49.** Specifically:

It is not far-fetched to assume that the Supreme Court of Justice, in a future decision, will recognize such a flagrant judicial error. . . .

*Id.* at 1238. He later states such incorporation is "absolutely incorrect and violative of what is said in Article 1064." *Id.* at 1239.

**50.** *Id.* at 1237–38. *Vinuela, supra,* also maintained this distinction in holding that non-Panamanian seamen are not entitled to thirteenth month pay while employed on Panamanian ships engaged in international service. 647 F.Supp. at 1146, 1987 A.M.C. at 556.

on the BERMUDA STAR. Repatriation has two separate and distinct contexts: (i) repatriation as required by Panamanian law (referred to, we think, in the ship's articles as "restitution"), and (ii) repatriation to the "country of origin" as provided for in the non-gratuity earning seamen's contracts. Our treatment of the various repatriation issues will take the following course: (a) we will review the provisions of the seamen's contracts and relevant to repatriation, then (b) we will consider whether the shipowner has fulfilled its obligation(s) to repatriate seamen under Panamanian law, and finally, (c) we will determine the legality under Panamanian law of the partial monthly wage deductions to pay for the seamen's repatriation.

### (a) The Fine Print

Looking at the contractual provisions for repatriation expenses and deductions from seamen's pay, we divide the seamen into two separate classes—(i) gratuity (GES) and (ii) non-gratuity (non-GES) earners.

Gratuity earning seamen, contracted under "Agreement C" had individually fixed monthly amounts deducted from their pay to cover "repatriation expenses." [51] If a GES completed his contract or was not terminated earlier for cause, these deductions were refunded to him. If he quit before contract completion, or was termi-

nated for cause, the shipowner would keep the deductions. (Affidavit of Captain Thorn.) Thus, actual repatriation was at the expense of the GES.

Non–GES were treated differently because their contracts entitled them to receipt of a ticket to their country of origin upon completion of their contract.[52] When non-GES completed their contracts, they received a full refund of the partial monthly deductions for repatriation [53] and an air ticket to the place where they were engaged. In the event a non-GES quit or was dismissed for cause, his "repatriation expenses" would be paid out of the wage deductions previously taken by the shipowner.

### (b) Shipowner's Panamanian Law Obligation to Repatriate

The seamen argue that *all* the seamen are entitled to repatriation to the place where they were engaged irrespective of what their contracts provide. They add that the employer must pay repatriation expenses if the crew member is dismissed without cause or "through no fault of his own" such as injury or illness.

The shipowner counters that except for seamen "engaged" within the territorial limits of Panama, Article 255 of the Labor Code [54] requires repatriation only be provid-

---

**51.** Agreement C provides:
 3. All expenses joining and leaving the vessel including air fares will be paid by the Employee. The EMPLOYER will deduct U.S. $_____ per month toward the cost of repatriation.
 The monthly deduction was either $25 or $50, although in two instances no amount was filled in.

**52.** Agreements A and B state in clauses 5 and 4 respectively:
 On completion of the full term of this agreement, the employer will furnish the employee with repatriation expenses to his/her *country of origin.* (Emphasis added).

**53.** Agreements A and B provided for repatriation deductions as follows:
 The employer reserves the right to [i] withhold one tenth of the employee's gross monthly pay until a return air ticket to his *country of origin* is accumulated, as costs towards repatriation expenses, should the employee not complete the full term of this agreement,

but [ii] such deduction will be refunded in full at the completion of this agreement.
 (The punctuation in Agreement B differs slightly but does not alter the provision's meaning.)

**54.** Article 255 provides:
 [i] It is the obligation of the employer to return the workman *to the place or port where he embarked* before the employment relationship is terminated, regardless of the type of contract.
 [ii] Notwithstanding, when the worker has been engaged in Panama, regardless of the port where he embarked,* the employer shall be obliged to return him *to the place where he was engaged.*
 [iii] The expenses in connection with the return trip must include those related to transportation, lodging, wages and maintenance during the trip, as well as the expenses worked out for the workers' departure. [Brackets inserted for convenience of reference.]
 * The seamen's brief, claiming a translation error, contends the Spanish term used should be

ed to the port where the seaman embarks on the vessel. The shipowner views the payment of repatriation expenses to the non-GES crew's country of origin as a perk, not a required payment. This is reflected by paragraphs 3 and 24 of the ship's articles which recognize an obligation to return such crew members to their "original port." [55]

Article 255 places a two-tiered repatriation obligation on the shipowner: (i) a crew member engaged outside of Panama must be repatriated to the "place or port where he embarked, regardless of the type of contract" [56] whereas (ii) a crew member *engaged* in Panama must be returned to the place of *engagement* regardless of the place where he embarked.

The Special Master's report reveals that when analyzing the shipowner's obligation to repatriate the seamen, he did not treat the GES crew members under Agreement C as a separate class.[57] But failure to make this distinction is not fatal. Panamanian law makes no legal distinction between GES and non-GES for purposes of determining an employer's obligation to shoulder the financial burden of repatriation expenses.

■ Therefore, we hold the shipowner is obligated to repatriate (i) all seamen who fulfill their contracts (i.e. those not discharged for cause or who have quit) to the point of embarkment (ii) except those seamen engaged in Panama who must be returned to the place where they were engaged. Only non-GES who complete their contracts are entitled—in conformance with their contracts—to repatriation to the country of their origin.

The seamen also challenge the Special Master's report and the District Court's adoption of it for not addressing the shipowner's obligation to repatriate seamen discharged prior to completion of their contract due to illness or injury. The seamen's expert states that in the event of "unilateral termination" of a seaman's employment contract, the employer must still pay repatriation expenses.

■ Article 257 of the Labor Code prohibits the termination of seamen, even for cause, while a vessel is at sea, or in a port which is neither the port of embarkment nor the place of engagement.[58] However, an employer can terminate an employee

---

translated as "was engaged" not "embarked." However, both the Defendant's Memorandum in Support of Motion for Summary Judgment and the Plaintiff's Memorandum in Opposition of Motion for Summary Judgment both attach and rely on the same English translation which uses the term embarked. That translation is: Labor Code of the Republic of Panama (Substantive Provisions) (J. Fabrega trans. 1974). We accept this translation.

From the standpoint of construction—not translation—acceptance of the seamen's proposed translation would eliminate the distinctions between subparts [i] and [ii]. As such there would be no need for a special provision for seamen engaged in Panama if *all* seamen are to be returned to the place of engagement.

For these reasons, we accept the agreed translation and find the seamen's objection unfounded. Incidentally, the District Court in *Vinuela* did not mention any problem with this translation of Article 255.

**55.** Paragraph 3 of the ship's articles provides: The crew will not be able to terminate their contracts nor fail to comply by them before their expiration, unless by a just and proved cause. In this case the Captain will [be] able to substitute him, complying with *the requisite of restituting the sailor to his original port.* (Emphasis added).

Paragraph 24 of the ship's articles covering extension of contracts which expire while the ship is on the high seas states: The restitution of the sailor to his *original port* will always be obligatory.

**56.** *See Vinuela, supra* (foreign seaman "responsible for his own transportation costs to and from the port of embarkment.")

**57.** *See* 663 F.Supp. at 1240.

**58.** Article 257 provides: The parties may not terminate the employment relationship, not even for just cause while the vessel is on a voyage. It shall be understood that the vessel is on a voyage when it is at sea or in a national or foreign port which is not one of those specified in article 255 for the return of the workman.

However, should the master find a substitute for the workman who wishes to leave his work while in any port, the employee can terminate the contract, complying with the legal provisions. The employer can terminate the labor contract, whenever the vessel is not in any of the ports to which article 255 refers, provided the workman is guaranteed his return ("repatriation")* to one of those ports and the payment of the benefits to which he might be entitled in

while in any port so long as he is returned to the place of embarkment or engagement in accordance with Article 255's requirements. Article 257 leaves no doubt in our minds that the employer is subject to the repatriation obligations of Article 255 if the employee is terminated due to illness or injury. We therefore reassert that the shipowner is required to repatriate these seamen to (i) the point of embarkment, but (ii) those engaged in Panama must be returned to the place of engagement.

### (c) Panamanian Legality of Deductions for Repatriation

█ The Special Master recognized that the seamen's contracts provided for monthly wage deductions for repatriation, and he expressly found that "said contracts comply with the repatriation provided for by Article 255 of the Code.[59] The District Court expressly accepted this conclusion that the shipowner's treatment of repatriation expenses violate neither Article 255 nor Panamanian law.[60] Assuming—as did both the Special Master and the District Court—that the repatriation deductions were indeed refunded in cash or in kind as required by the seamen's contracts and Panamanian law, we hold that these deductions are permissible under Panamanian law.[61]

### III. Lessons in United States Law Admiralty 301: Mom, Apple Pie and Penalty Wages

Having determined that the deductions are allowable under Panamanian law, the question is whether there is any illegality under United States law. The seamen contend (i) that the deductions are not within the statutory definition of allotments and (ii) the deductions must be refunded with interest.

█ The District Court carefully analyzed the shipowner's practice with respect to taking partial monthly wage deductions to cover repatriation expenses and correctly concluded that U.S. law has not been violated.[62] The District Court properly distinguished this case from *Isbrandtsen Co. v. Johnson,* 343 U.S. 779, 72 S.Ct. 1011, 96 L.Ed. 1294, 1952 A.M.C. 1283 (1952), because the withholding of partial wages from the seamen is temporary in our instant case, whereas in *Isbrandtsen* the seaman permanently lost his earnings. For that temporary withholding no requirement exists within the statutory scheme affecting seamen wage payments that such withheld wages while held by the shipowner must reflect interest until the conclusion of a voyage.

The BERMUDA STAR falls nominally within the commands of 46 U.S.C. §§ 10313–16 because it operated in and out of U.S. ports.[63] Under these United States statutes a foreign flag shipowner, upon entry into a United States port, is faced with the prospect of potential statutory penalties when and as it pays either half wages [64] or full wages upon completion of

accordance with the terminated labor contract. *(Parentheses in original.)

**59.** 663 F.Supp. at 1240.

**60.** 663 F.Supp. at 1229.

**61.** We emphasize again the limited nature of this interlocutory appeal: we are declaring general principles to be applied. All factual questions are reserved to the next stage in the District Court.

**62.** 663 F.Supp. at 1229–30, 1987 A.M.C. at 1380–83.

**63.** 46 U.S.C. § 10313(i) provides: "[t]his section applies to a seaman on a foreign vessel when in a harbor of the United States."

**64.** 46 U.S.C. § 10313(e) provides in pertinent part:

(e) After the beginning of the voyage, a seaman is entitled to receive from the master, on demand, [i] one-half of the balance of wages earned and unpaid at each port at which the vessel loads or delivers cargo during the voyage. [ii] A demand may not be made before the expiration of 5 days from the beginning of the voyage, not more than once in 5 days, and not more than once in the same port on the same entry. [iii] If a master does not comply with this subsection, the seaman is released from the agreement and is entitled to payment of all wages earned.

(Brackets inserted for ease of reference.) *See also* Norris, *Law of Seamen,* §§ 17:28; 17:29; 17:30 (4th ed. 1985).

the voyage.[65] That these statutory penalties[66] can result in severe consequences for shipowners, one only need casually glance at *Griffin v. Oceanic Contractors,* 458 U.S. 564, 102 S.Ct. 3245, 73 L.Ed.2d 973, 1982 A.M.C. 2377 (1982) where failure to promptly pay seamen $412.50 in wages resulted in an award of over $300,000 under § 596 (recodified as § 10313).

We are faced here with the issue of whether Congress intended that temporary withholdings, permitted by the law of the flag of the vessel, would thus trigger the double wage penalty. As a matter of statutory construction, while these repatriation deductions are not listed *per se* as permissible allotments in §§ 10315 and 10316, the statutory framework does not relate to specific temporary deductions. Although § 10315(e) provides that § 10315 applies to "foreign vessels when in waters of the United States" and thereby subjects the vessel, its "owner, charterer, managing operator, agent, or master" to liability to the United States government for civil penalties (as does § 10314(c) respecting unlawful advances), we think this relates to allotments which are physically prescribed, i.e. initiated, in the United States port. They do not relate to withholdings made in such United States port which are valid under the laws of the vessel's flag.

■ Considering the severe consequences of a failure to pay the seamen's wages in *full* [67] we cannot believe that Congress meant to subject the ship master to the risk that a temporary withholding valid under the law of the ship's flag is at the same time illegal under the law of the United States. *Cf. Sandberg v. McDonald,* 248 U.S. 185, 196, 39 S.Ct. 84, 86, 63 L.Ed. 200, 204 (1918); *Strathearn Steamship Co. v. Dillon,* 252 U.S. 348, 355, 40 S.Ct. 350, 352, 64 L.Ed. 607, 611 (1920).

The legislative intent of §§ 10313–16 and its precursors was "to protect [seamen] from the harsh consequences of arbitrary and unscrupulous action[s] of their employers."[68] Although setoffs and deductions from a seaman's wages are stated to be permissible only if expressly provided for by Congress,[69] more recently the Supreme Court has emphasized that Congress sought to prevent the unjust enrichment of shipowners who denied seamen wages and benefits rightfully earned. *American Foreign Steamship Company v. Matise,* 423 U.S. 150, 159, 96 S.Ct. 410, 416, 46 L.Ed.2d 354, 362, 1975 A.M.C. 2594, 2600 (1975).

The act of partial monthly withholding with ultimate complete reimbursement being valid under United States law, the only thing remaining is the contention that the reimbursement itself becomes illegal because no interest is paid or allowed.

First, there is no language in §§ 10313–10316 either prescribing (or implying) that wages are to be paid with interest or that failure to include interest would constitute a non-payment of wages in full. Indeed, Congressional purpose is to the contrary.

This is evidenced by the express grant to shipowners of the right to hold 50% of the seamen's earned wages temporarily until the completion of the voyage. *See* nn. 64

---

**65.** Section 10313(f) provides:

At the end of a voyage, the master shall pay each seaman the balance of wages due the seaman [i] within 24 hours after the cargo has been discharged or [ii] within 4 days after the seaman is discharged, whichever is earlier. When a seaman is discharged and final payment of wages is delayed for the period permitted by this subsection, the seaman is entitled at the time of discharge to one-third of the wages due the seaman. (Brackets inserted for convenience of reference.)

**66.** Section 10313(g) prescribes the penalty for a violation of § 10313(f):

When payment is not made as provided under subsection (f) of this section without sufficient cause, the master or owner shall pay to the seaman 2 days' wages for each day payment is delayed.

**67.** Theoretically at least, failure to pay $325.16 by tendering $325.15 would subject the shipowner to potential double wages. But *see* n. 70, *infra.*

**68.** *American Foreign Steamship Company v. Matise,* 423 U.S. 150, 160, 96 S.Ct. 410, 416, 46 L.Ed.2d 354, 362, 1975 A.M.C. 2594, 2601 (1975) (quoting *Collie v. Fergusson,* 281 U.S. 52, 55, 50 S.Ct. 189, 191, 74 L.Ed. 696, 698, 1930 A.M.C. 408, 410 (1930)).

**69.** *Isbrandtsen Co. v. Johnson,* 343 U.S. 779, 72 S.Ct. 1011, 96 L.Ed. 1294, 1952 A.M.C. 1283 (1952).

and 65, *supra.* We reject the claim for interest on the temporary partial withholdings for repatriation.

 We emphasize, however, that our holding is based on the assumption that the repatriation expense deductions were properly refunded in the correct amounts as required by Panamanian law. That assumption will be tested in the accounting phase of this action. Any amount not refunded as required by Panamanian law is without a doubt subject to payment without interest to the respective seamen. Merely fueled by speculation, we will not consider whether a failure to refund the repatriation deductions triggers § 10313(g)'s double wage penalty.[70]

### IV. Conclusion

The District Court erred in accepting the Special Master's determination of Panamanian law as applied to the plaintiff seamen, only with respect to the formula for overtime pay. We decline to determine the formula for calculating vacation pay, thus requiring the District Court to consider this issue in the first instance on remand. We hold the shipowner's deductions for repatriation expenses did not violate United States legal restrictions on deductions from seamen's pay. It remains to be seen upon remand to the District Court for the accounting phase of this action whether any additional payments are due the seamen.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.

---

**70.** We do caution at this juncture that the double wage penalty is not triggered merely by a wrongful withholding. The "without sufficient cause" standard of § 10313(g) requires the unlawful withholding must be arbitrary or unreasonable. *Larkins v. Hudson Waterways Corp.,* 640 F.2d 997, 999 (9th Cir.1981). This should be kept in mind during the accounting phase when the now unspecified demands and claims of individual seamen for wages and benefits due take shape.

We caution also both the District Court on remand and to all those who will read and embrace or distinguish this opinion that we express no views as to (i) the availability of or liability for double wages, (ii) the demand therefore, or (iii) defenses to "without sufficient cause." *See* Norris, *supra,* §§ 17:1; 17:5–8; 17:12; 17:19.